# United States Court of Appeals
## For the First Circuit

No. 19-1390

UNITED STATES OF AMERICA,

Plaintiff, Appellant,

v.

JOSÉ LUIS VAELLO-MADERO,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Thompson, Circuit Judges.

Michael Shih, Attorney, Appellate Staff, Civil Division, U.S. Department of Justice, with whom Laura E. Myron, Attorney, Appellate Staff, Joseph H. Hunt, Assistant Attorney General, and Abby C. Wright, Attorney, Appellate Staff, were on brief, for appellant.

Hermann Ferré, with whom Juan O. Perla, Robert Groot, Curtis, Mallet-Prevost, Colt & Mosle LLP, and John W. Ferré-Crossley, were on brief, for appellee.

Dwyer Arce, and Kutak Rock LLP, on brief for Virgin Islands Bar Association, amicus curiae.

Carlos Lugo-Fiol, and Isaías Sánchez-Báez, Solicitor General of Puerto Rico, on brief for the Commonwealth of Puerto Rico, amicus curiae.

Verónica Ferraiuoli-Hornedo, on brief for Hon. Jenniffer A. González-Colón, Resident Commissioner of Puerto Rico, amicus curiae.

Gregorio Igartúa, on brief for himself, amicus curiae.

---

April 10, 2020

---

**TORRUELLA**, **Circuit Judge**. This appeal raises a fundamental question of constitutional law requiring us to consider the equal protection component of the Fifth Amendment as it applies to the residents of Puerto Rico.[1] Specifically, Appellee claims that the exclusion of Puerto Rico residents from receiving the disability benefits that are granted to persons residing in the fifty States, the District of Columbia, and the Northern Mariana Islands under the Supplemental Security Income (SSI) provisions of Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383(f), contravenes the equal protection guarantees of the Fifth Amendment. Appellee in this case became eligible and commenced receiving SSI disability benefits while residing in New York. Nevertheless, these benefits were discontinued when the Social Security Administration (SSA) became aware that he had moved to Puerto Rico. The SSA proceeded to enforce the provision of this legislation that requires a recipient of SSI benefits to reside within the United States, defined by statute as the geographical territory of the fifty States, the District of Columbia, and the Northern Mariana Islands, and authorizes the termination of these payments if the recipient resides more than

---

[1] "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. See Examining Bd. of Eng'rs, Architects, & Surveyors v. Flores de Otero, 426 U.S. 572, 600 (1976).

-3-

thirty consecutive days outside the "United States" as so defined. See id. §§ 1382c(a)(1)(B)(i), 1382c(e); see also Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, Pub. L. No. 94-241, § 502(a)(1), 90 Stat. 263, 268 (1976).

## I.  Background

### A.  The factual background of this appeal

SSI provides benefits to low income individuals who are older than sixty-five, blind, or disabled.  See 42 U.S.C. §§ 1382(a), 1382c.  In contrast to other types of federal insurance programs, like Social Security Title II benefits, 42 U.S.C. §§ 401-433, which are paid for by payroll taxes, Congress funds SSI from the general treasury.  See 42 U.S.C. § 1381; see also Pub. L. No. 116-94, 133 Stat. 2534, 2603 (2019) (funding SSI for fiscal year 2020).  SSI is a means-tested program, so only those individuals who meet the age, disability, or blindness requirements and fall beneath the federally mandated income and asset limits are eligible.  42 U.S.C. § 1382.[2]

Defendant-Appellee José Luis Vaello-Madero was born in 1954.  Then, as now, all those born in Puerto Rico are citizens

---

[2]  For more information about SSI, see Mary Daly & Richard Burkhauser, The Supplemental Security Income Program, in Means-Tested Transfer Programs in the U.S. 79 (Robert Moffitt ed., Univ. of Chicago Press 2003).

-4-

of the United States pursuant to the Jones Act of 1917, 39 Stat. 953, § 5 (1917), and subsequent legislation granting birthright citizenship to Puerto Rico's native-born inhabitants, see 8 U.S.C. § 1402.

In 1985, Appellee moved to New York where he resided until 2013. In the later part of his residence in New York, Appellee was afflicted with severe health problems, conditions which forced him to seek succor under the SSI program. In June 2012, Appellee was found eligible to receive SSI disability benefits and thus commenced receiving SSI payments, the monthly amounts deposited directly by the SSA into his checking account in a New York bank.

In July 2013, Appellee relocated to Loíza, Puerto Rico. According to Appellee, he moved there to help care for his wife, who had previously moved to Puerto Rico due to her own health issues.

Appellee contends that he first became aware of the SSI issues related to his moving to Puerto Rico in June 2016, when he filed for Title II Social Security benefits at the SSA office in Carolina, Puerto Rico. Thereafter, as a result of his disclosure to the SSA authorities that he had moved to Puerto Rico, on or about July 27, 2016, the SSA informed Appellee in a "Notice of Planned Action" that it was discontinuing his SSI benefits

retroactively to August 1, 2014 because he was, and had been since that date, "outside of the U.S. for 30 days in a row or more." According to this notification, the SSA "consider[ed] the U.S. to be the 50 States of the U.S., the District of Columbia, and the Northern Mariana Islands." As previously alluded to, the SSA was acting pursuant to the statutory provisions that establish that to be eligible to receive SSI benefits the individual must be a "resident of the United States," 42 U.S.C. § 1382c(a)(1)(B)(i), defined therein "when used in a geographic sense, [as meaning,] the 50 States and the District of Columbia," id. § 1382c(e). The Northern Mariana Islands were added within the coverage of SSI in 1976 pursuant to Section 502(a)(1) of Public Law 94-241. 90 Stat. 263, 268 (1976) (codified as 48 U.S.C. § 1801); see also 20 C.F.R. § 416.215.

**B. The United States files suit in U.S. District Court**

Approximately one year after the discontinuation of Appellee's SSI benefits, the United States filed an action against him in the U.S. District Court for the District of Puerto Rico. The United States sought to collect the sum of $28,081, the amount the SSA claimed was owed by Appellee to the United States due to the allegedly improper payment of SSI benefits since his relocation to Puerto Rico. Jurisdiction was claimed pursuant to 28 U.S.C. § 1345, which applies to any civil case "commenced by the United

-6-

States," and by virtue of a criminal statute, 42 U.S.C. § 408(a)(4), which provides for criminal penalties of up to five years' incarceration for fraudulent social security claims.

In the meantime, an SSA investigator sought and procured from Appellee, who at the time was unrepresented by an attorney, the signing of a Stipulation of Consent Judgment, which was thereafter filed in court by the United States. The court proceeded to appoint pro bono counsel to represent Appellee. Upon entering the case, Appellee's counsel moved to relieve him of the Stipulation, and further proceeded to file an answer to the complaint raising as an affirmative defense that the exclusion of Puerto Rico residents from the SSI program violated the equal protection guarantees of the Fifth Amendment.

Thereafter, the United States moved for voluntary dismissal without prejudice, stating that "out of an abundance of caution" it agreed to withdraw the Stipulation, and conceding that the criminal statute alleged did not confer jurisdiction on the district court in this case, which was civil in nature. The court denied the voluntary dismissal but proceeded to approve the withdrawal of the Stipulation.[3] Considering that there remained no material facts in contention between the parties, and that the

_____

[3] The district court maintained jurisdiction pursuant to 28 U.S.C. § 1345, which applies to any case "commenced by the United States."

-7-

outcome of the case depended solely on the determination of a legal question, namely, whether the exclusion of persons residing in Puerto Rico from SSI coverage under the circumstances of this case violated the equal protection guarantees of the Constitution, both parties proceeded to file for summary judgment in support of their respective positions.

C.  **The opinion of the district court**

On February 4, 2019, the district court issued its opinion.  See United States v. Vaello-Madero, 356 F. Supp. 3d 208 (D.P.R. 2019).  After disposing of various preliminary matters (none of which are the subject of this appeal or of relevance to its disposition), the court granted Appellee's Motion for Summary Judgment and denied Appellant's cross motion on the same issues, which in substance dealt with Appellee's allegation of the denial of equal protection in the categorical exclusion of SSI benefits to persons who reside in Puerto Rico.  Id. at 211.  The district court proceeded to distinguish the two Supreme Court cases on which Appellant plants its flag in an attempt to negate Appellee's equal protection claims, namely Califano v. Gautier Torres, 435 U.S. 1 (1978) (per curiam) and its sequel Harris v. Rosario, 446 U.S. 651 (1980) (per curiam).  Id. at 215 n.7.  Appellant cited these cases as permitting the differential treatment of persons who resided in Puerto Rico, pursuant to the plenary powers granted to Congress

-8-

under the Territory Clause,[4] "so long as there [was] a rational basis for [Congress's] actions," Harris, 446 U.S. at 651-52. The district court nevertheless ruled that Congress's decision to "disparately classify United States citizens residing in Puerto Rico" ran "counter to the very essence and fundamental guarantees of the Constitution itself." Vaello-Madero, 356 F. Supp. 3d at 213. More on point, it concluded that Congress's actions in the present case "fail[] to pass rational basis constitutional muster" because "[c]lassifying a group of the Nation's poor and medically neediest United States citizens as 'second tier' simply because they reside in Puerto Rico is by no means rational." Id. at 214. It then expressed the view that the statute in question discriminates on the basis of a suspect classification because "[a]n overwhelming percentage of the United States citizens [who] resid[e] in Puerto Rico are of Hispanic origin." Id. Citing to Boumediene v. Bush, 553 U.S. 723 (2008), and United States v. Windsor, 570 U.S. 744 (2013), the district court concluded that the ratio decidendi of Califano and Harris predated "important subsequent developments in the constitutional landscape," and having suffered erosion by the passage of time and these changed

_____

[4]  "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."  U.S. Const., art. IV, § 3, cl. 2.

circumstances, required that a new look be taken at these questions.  Vaello-Madero, 356 F. Supp. 3d at 215 n.7.

In considering the substance of the opinion appealed from, we must heed the admonition given by the Supreme Court to lower courts as regards the continuing binding force of Supreme Court precedent.  The Supreme Court has not been equivocal in its dictates on this subject, stating that the decisions of that Court "remain binding precedent until [the Court] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."  Hohn v. United States, 524 U.S. 236, 252-53 (1998).  It has therefore ruled that "it is [the Supreme] Court's prerogative alone to overrule one of its precedents."  State Oil Co. v. Kahn, 522 U.S. 3, 20 (1997); see also Eberhart v. United States, 546 U.S. 12, 19-20 (2005) (commending the Seventh Circuit for following Supreme Court precedent despite the appellate court's "grave doubts").  Although we, of course, cannot and do not quibble with such forceful and binding mandates, we would be remiss in complying with our own duty were we to blindly accept the applicability of Califano and Harris without engaging in a scrupulous inquiry into their relevance, application, and precedential value.  Therefore, while we decline to follow the district court's methodology, our review of the equal protection question at issue -- whether the exclusion

-10-

of Puerto Rico residents from receiving SSI violates the Fifth Amendment -- even in a universe where Califano and Harris remain on the books, leads us to the same result.   For the reasons explained below, we affirm.

## II.  Discussion

### A.  Equal protection principles survive Califano and Harris

Our review of the district court's grant of summary judgment is de novo.  Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 46 (1st Cir. 2019).  We are not tied to the district court's reasoning and "may affirm on any independent ground made manifest by the record."  Jones v. Secord, 684 F.3d 1, 5 (1st Cir. 2012).

Discrimination by the federal government violates the Fifth Amendment when it constitutes "a denial of due process of law."  Bolling v. Sharpe, 347 U.S. 497, 499 (1954).  This is referred to as the equal protection component of the Fifth Amendment.  U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 533 (1973).  "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."  Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 224 (1995) (quoting Buckley v. Valeo, 424 U.S. 1, 93 (1976) (per curiam)); see Bolling, 347 U.S. at 500 ("[I]t would be unthinkable that the same

Constitution would impose a lesser duty on the Federal Government.").

It is beyond question at present that precedent requires us to apply rational basis review to the equal protection claim before us. Furthermore, following this path, it is appropriate that "[a] legislative classification . . . be sustained, if the classification itself is rationally related to a legitimate government interest." Moreno, 413 U.S. at 533 (citing Jefferson v. Hackney, 406 U.S. 535, 546 (1972)). "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect." Dandridge v. Williams, 397 U.S. 471, 485 (1970). Thus, "those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.'" FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993) (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973)). Equal protection does not "require a legislature to articulate its reasons for enacting a statute," and the "conceived reason[s]" put forth in support of the statute in litigation do not need to be the same as those that "actually motivated the legislature." Id.

Inquiring into the stated reason for enacting this legislation reveals that Congress created SSI "[f]or the purpose

-12-

of establishing a national program to provide supplemental security income to individuals who have attained age 65 or are blind or disabled." 42 U.S.C. § 1381. "Every aged, blind, or disabled individual who is determined . . . to be eligible on the basis of his income and resources shall . . . be paid benefits by the Commissioner of Social Security." Id. § 1381a. Here, the classification subject to challenge can be defined as: individuals who meet all the eligibility criteria for SSI except for their residency in Puerto Rico. This classification is clearly irrelevant to the stated purpose of the program, which is to provide cash assistance to the nation's financially needy elderly, disabled, or blind. See Moreno, 413 U.S. at 534. Therefore, if we are to sustain this classification, it "must rationally further some legitimate governmental interest other than those specifically stated in the congressional [statement of purpose.]" Id.

Today, Appellant offers two explanations for the exclusion of Puerto Rico residents: "the unique tax status of Puerto Rico and the costs of extending the program to residents of Puerto Rico." But, as acknowledged above, we do not write on a blank page. We thus commence with an inquest into the lead case cited by Appellant, Califano v. Gautier Torres,[5] 435 U.S. 1, which

_____

[5] The Supreme Court opinion refers to the appellee in Califano as

-13-

is a brief per curiam opinion summarily reversing without oral argument the decision of a three-judge district court that held that the denial of SSI benefits to a recipient who acquired them while a resident of Connecticut, but was thereafter denied them by reason of his moving to Puerto Rico, violated his constitutional right to travel. See Gautier Torres v. Mathews, 426 F. Supp. 1106, 1113 (D.P.R. 1977) ("[T]here is a lack of such compelling state interest as to justify penalizing Plaintiff's right to travel."). Disagreeing with the majority, Justice Brennan would have voted to affirm the opinion of the district court, and Justice Marshall would have noted probable jurisdiction and set the case for oral argument. Califano, 435 U.S. at 5.

The principal reason for reliance by Appellant on Califano is contained in this part of the Court's opinion:

> [W]e deal here with a constitutional attack upon a law providing for governmental payments of monetary benefits. Such a statute "is entitled to a strong presumption of constitutionality." "So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straightjacket."

435 U.S. at 5 (emphasis supplied) (citation omitted) (quoting Mathews v. De Castro, 429 U.S. 181, 185 (1976) and Jefferson, 406

---

"Torres," but Hispanics usually use both the paternal and maternal last names, so the correct appellation used should have been "Gautier Torres," as used by the district court.

-14-

U.S. at 546). That quote, of course, basically embodies so-called rational basis review, "a paradigm of judicial restraint." Beach Commc'ns, Inc., 508 U.S. at 314. Although the appropriateness of applying this test to the issues and facts presently before us cannot be questioned, the relevance of Califano's ultimate conclusion summarily reversing the district court demands dedicated scrutiny.

Califano is an opinion in which the footnotes are almost as important as its main text. Commencing with footnote four,[6] a major distinction becomes apparent between the holding in Califano and the present case. The present case challenges the disparate treatment of the residents of Puerto Rico on equal protection

---

[6] Footnote four reads:

> The complaint had also relied on the equal protection component of the Due Process Clause of the Fifth Amendment in attacking the exclusion of Puerto Rico from the SSI program. Acceptance of that claim would have meant that all otherwise qualified persons in Puerto Rico are entitled to SSI benefits, not just those who received such benefits before moving to Puerto Rico. But the District Court apparently acknowledged that Congress has the power to treat Puerto Rico differently, and that every federal program does not have to be extended to it. Puerto Rico has a relationship to the United States "that has no parallel in our history."

Califano, 435 U.S. at 3 n.4 (quoting Flores de Otero, 426 U.S. at 596; then citing Balzac v. Porto Rico, 258 U.S. 298 (1922); Dorr v. United States, 195 U.S. 138 (1904); Downes v. Bidwell, 182 U.S. 244 (1901)).

-15-

grounds, while Califano was decided on issues related to the right to travel. Although the complaint in Califano alleged an equal protection claim, as is clearly reflected by its opinion, the three-judge district court decided the case strictly on issues related to the fundamental constitutional right to travel, Gautier Torres, 426 F. Supp. at 1108, 1110, 1113, a holding the Supreme Court recognized in footnote four. Califano, 435 U.S. at 3 n.4; see Harris, 446 U.S. at 654-655 (Marshall, J., dissenting) ("[T]he District Court relied entirely on the right to travel, and therefore no equal protection question was before this Court. The Court merely referred to the equal protection claim briefly in a footnote . . . . At most, [this is] reading[] more into that single footnote of dictum [in Califano] than it deserves." (citation omitted) (emphasis supplied)). As acknowledged by the Court, and vigorously endorsed by Justice Marshall in his dissent in Harris, there was no equal protection question before the Court in Califano. See Harris, 446 U.S. at 654-655 (Marshall, J., dissenting).

This brings us to the second case upon which Appellant relies, Harris v. Rosario, which involved a class action lawsuit regarding the Aid to Families with Dependent Children program (AFDC), 42 U.S.C. §§ 601-619, in which the plaintiffs alleged a violation of equal protection because the U.S. citizens residing

in Puerto Rico received less financial assistance under that program than persons who resided in the States. See 446 U.S. at 651-52. The district court found that the statute created a "suspect classification" that did not withstand "strict constitutional scrutiny in absence of a compelling valid state interest." Mot. for Summ. Affirmance at 15a, Harris v. Rosario, 446 U.S. 651 (1980) (No. 79-1294) (attaching Santiago Rosario v. Califano, Civ. No. 77-303 (D.P.R. Oct. 1, 1979)).[7] The Supreme Court summarily reversed the district court's holding that the equal protection component of the Fifth Amendment was violated by this discriminatory treatment, ruling instead that Congress, which is empowered under the Territory Clause of the Constitution "to 'make all needful Rules and Regulations respecting the Territory . . . belonging to the United States,' may treat Puerto Rico differently from States so long as there is a rational basis for its actions." Harris, 446 U.S. at 651-52 (quoting U.S. Const. art. IV, § 3, cl. 2). The Court then proceeded to enumerate the following three factors listed in footnote seven of Califano, which in the Court's view, "suffice[d] to form a rational basis":

> Puerto Rican residents do not contribute to the
> federal treasury; the cost of treating Puerto Rico as

---

[7] While the district court's analysis referred to the "U.S. citizens living in Puerto Rico," id. at 1a, the Supreme Court assessed the question in Harris as to Puerto Rico residents, 446 U.S. at 651-52.

> a State under the statute would be high; <u>and</u> greater
> benefits could disrupt the Puerto Rican economy.

<u>Id.</u> at 652 (emphasis added) (citing <u>Califano</u>, 435 U.S. at 5 n.7).[8]
With that, the Court validated the differential treatment of Puerto
Rico with respect to the <u>block grants received by the territory
under the AFDC program</u>.

What should be patently clear is that the Court ruled in
<u>Califano</u> on the validity of SSI's treatment of the persons residing
in Puerto Rico, <u>as affected by the right to travel</u>, while in <u>Harris</u>
it was called to pass upon differential treatment of <u>block grants
under the AFDC program</u> in light of the equal protection component
of the Fifth Amendment.  Contrary to Appellant's contention, the
Court has never ruled on the validity of alleged discriminatory
treatment of Puerto Rico residents as required by the SSI program
under the prism of equal protection.

Of relevance to Appellant's contention that <u>Califano</u> and
<u>Harris</u> control this appeal is an axiomatic legal tenet that must
be factored into consideration of our ultimate decision: that

---

[8]  We find it persuasive that, as pointed out in <u>Peña Martínez</u>,
the Supreme Court's use of the conjunctive "and" when listing the
three considerations that "suffice[d] to form a rational basis"
suggests "that no one 'consideration' independently sufficed to
justify the exclusion of Puerto Rico residents from eligibility
for SSI."  <u>Peña Martínez</u> v. <u>Azar</u>, 376 F. Supp. 3d 191, 207-08
(D.P.R. 2019) (citing <u>OfficeMax, Inc.</u> v. <u>United States</u>, 428 F.3d
583, 589 (6th Cir. 2005)).

"[t]he precedential effect of a summary [disposition] can extend no further than 'the precise issues presented and necessarily decided by those actions.'" Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 182 (1979) (quoting Mandel v. Bradley, 432 U.S. 173, 176 (1977)); see Mandel, 432 U.S. at 180 (Brennan, J., concurring) ("[J]udges . . . are on notice that, before deciding a case on the authority of a summary disposition . . . they must (a) examine the jurisdictional statement in the earlier case to be certain that the constitutional questions presented were the same . . . ."). Summary dispositions "are not of the same precedential value as would be an opinion of this Court treating the question on the merits." Edelman v. Jordan, 415 U.S. 651, 671 (1974). We are of the view that Califano was not decided on equal protection grounds, and that Harris did not involve a challenge to SSI direct aid to persons, and thus, neither case forecloses Appellee's present contention that his wholesale exclusion from SSI violates the equal protection guarantee. We do not view Califano and Harris as a carte blanche for all federal direct assistance programs to discriminate against Puerto Rico residents. There still must be a rational justification for the classification. To hold otherwise would "render the rational basis test a nullity and would 'suspend the operation of the Equal Protection Clause in the field of social welfare law'" as it

relates to all U.S. residents who dwell in Puerto Rico.  Baker v. City of Concord, 916 F.2d 744, 749 (1st Cir. 1990) (quoting Ranschburg v. Toan, 709 F.2d 1207, 1211 (8th Cir. 1983)).  We decline to read these cases so broadly.[9]

Additionally, there are several other reasons why Califano and Harris are not precisely on point.  Today, Appellant makes no claim that granting "greater [SSI] benefits [to Puerto Rico residents at this time] could disrupt the economy."  Harris, 446 U.S. at 652.  It may be that Appellant took heed of Justice Marshall's dissent in Harris in which he poignantly stated regarding this third factor:

> This rationale has troubling overtones.  It suggests that programs designed to help the poor should be less fully applied in those areas where the need may be the greatest, simply because otherwise the relative poverty of recipients compared to other persons in the same geographic area will somehow be upset.  Similarly, reliance on the fear of disrupting the Puerto Rican economy implies that Congress intended to preserve or even strengthen the comparative economic position of the States vis-à-vis Puerto Rico.

---

[9] Appellant cites United States v. Ríos-Rivera, 913 F.3d 38, 44 (1st Cir. 2019), as evidence that our Court has recently sanctioned Congress's differential treatment of Puerto Rico under Califano and Harris.  Reviewing under plain error whether the prosecution of a defendant under the Mann Act, 18 U.S.C. § 2423(a), violated his equal protection rights, this Court in Ríos-Rivera held that the district court did not err by not sua sponte applying heightened scrutiny and rejected the argument that Congress's decision was irrational because it "never explained its justification for treating trafficking within Puerto Rico differently from interstate trafficking."  Id. at 44.  Nothing about that holding is inconsistent with the result we reach today.

Under this theory, those geographic units of the country which have the strongest economies presumably would get the most financial aid from the Federal Government since those units would be the least likely to be "disrupted." Such an approach to a financial assistance program is not so clearly rational as the Court suggests . . . .

Harris, 446 U.S. at 655-56 (Marshall, J., dissenting) (citations omitted).[10] Referring back to the Court's original endorsement of

---

[10]  In an effort to comprehend what was meant by this third factor, we located a post-hoc explanation of the exclusion of Puerto Rico from SSI -- a statement in a 1990 congressional briefing on Puerto Rico's status. See Briefing on Puerto Rico Political Status by the General Accounting Office & the Cong. Research Serv.: Hearing Before the Subcomm. of Insular & Int'l Affairs of H. Comm. on Interior & Insular Affairs, 101st Cong. 34 (1990) (statement of Carolyn Merk, Specialist in Social Legislation).  The CRS staff member, who had been a House staffer at the time SSI was passed, explained:

> Some of the reasons SSI does not apply in Puerto Rico pertain to income disparity between the mainland United States and Puerto Rico and what could potentially happen to the income distribution of the population there. Similar concerns were raised at the time about extending Federal benefit levels to low-income States such as Alabama or Mississippi. . . . [I]t is certainly true that when you raise someone's income by tenfold there can be serious effects on the labor supply and work incentives and disincentives of the non-SSI members of the family, who may not even earn as much as the SSI benefit.  Raising the income from $32 or whatever, tenfold a month, where the amount may be a fair wage on the part of the full-time workers, or in some cases, of the primary earner's family, has been an issue, and continues to be a primary question.

Id.  Any concerns related to "economic disruption" should be met with suspicion considering the present circumstances of Puerto Rico's economic affairs and the legislation that has been enacted by Congress since Harris and Califano were decided.  See

-21-

this rationale in <u>Califano</u>, one might find the Court's citation to the Report of the Undersecretary's Advisory Group on Puerto Rico, Guam and the Virgin Islands perplexing. <u>Califano</u>, 435 U.S. at 5 n.7 (citing Dep't of Health, Educ., & Welfare, <u>Report of the Undersecretary's Advisory Group on Puerto Rico, Guam and the Virgin Islands</u> 6 (1976) [hereinafter <u>1976 Report</u>]); <u>see</u> <u>Peña Martínez</u> v. <u>Azar</u>, 376 F. Supp. 3d 191, 208 (D.P.R. 2019) (noting that the cited report does not support an economic theory for why Puerto Rico's inclusion in SSI would disrupt the economy and instead highlights the success of the extension of the Food Stamp Program to Puerto Rico). In fact, the 1976 Report expressly rejected concerns about an influx of aid disrupting the economy as a justification for disparate treatment, concluding that "the current fiscal treatment of Puerto Rico . . . is unduly discriminatory and undesirably restricts the ability of these jurisdictions to meet their public assistance needs." <u>1976 Report</u>, <u>supra</u> at 6-7.

---

Puerto Rico Oversight, Management, and Economic Stability Act, 48 U.S.C. §§ 2101-2241 (2018) (creating an unelected oversight board to govern Puerto Rico's budget and fiscal affairs); Small Business Job Protection Act of 1996, Pub. L. No. 104-188, tit. I(f), § 1601(a), 110 Stat. 1755, 1827 (repealing the 1976 federal income tax credit for business income derived from Puerto Rico). Nevertheless, if we were to indulge this rationale now, it would be worth noting that when determining SSI eligibility, because monthly income disregards and allowable assets are not indexed for inflation, the passage of time has "effectively eroded the value of SSI benefits and narrowed the population of potential recipients relative to 1974 levels." Daly & Burkhauser, <u>supra</u> note 2, at 85.

-22-

Therefore, considering the dubious nature of this once-accepted rationale, we are relieved that we are not called upon to decipher it and note its abandonment only as an additional factor that weakens the relevance of Califano and Harris for this appeal. In fact, if anything, the former Court's acceptance of this now defunct argument and citation to "a contemporary policy evaluation document" -- the 1976 Report -- sets us up to consider the present-day circumstances surrounding Puerto Rico's exclusion from SSI and whether the current classification is unrelated to a legitimate government interest.  Peña Martínez, 376 F. Supp. 3d at 208; see United States v. Carolene Prods. Co., 304 U.S. 144, 153 (1938) ("[T]he constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing . . . that those facts have ceased to exist." (citing Chastleton Corp. v. Sinclair, 264 U.S. 543 (1924)).  This last point notwithstanding, because of the similarity of the issues raised in the present appeal to those in Harris, we apply rational basis analysis to the equal protection challenges made to the SSI program.

**B.  The denial of SSI benefits to Appellee does not meet rational basis criteria**

Although "a noncontractual claim to receive funds from the public treasury enjoys no constitutionally protected status, . . . Congress may not invidiously discriminate among such

-23-

claimants on the basis of a 'bare congressional desire to harm a politically unpopular group,' or on the basis of criteria which bear no rational relation to a legitimate legislative goal." Weinberger v. Salfi, 422 U.S. 749, 772 (1975) (internal citations omitted) (first quoting Moreno, 413 U.S. at 534; then citing Jimenez v. Weinberger, 417 U.S. 628, 636 (1974) and U.S. Dep't of Agric. v. Murry, 413 U.S. 508, 513-14 (1973)). "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446 (1985) (striking down a zoning ordinance that restricted the location of homes for the mentally disabled as arbitrary and irrational). "The search for the link between classification and objective gives substance to the Equal Protection Clause." Romer v. Evans, 517 U.S. 620, 632 (1996). "A critical, if highly deferential, examination is called for, to be conducted case by case with an awareness that statutes such as are at issue here enjoy a 'presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality.'" Baker, 916 F.2d at 749 (quoting Kadrmas v. Dickinson Pub. Schs., 487 U.S. 450, 462 (1988)).

   With this framework in place, we arrive at the two rational basis arguments which Appellant claims overcome

-24-

Appellee's equal protection contentions: the tax status of Puerto Rico residents and the costs of extending SSI to them. We take each in turn.

**1.**

At the outset, we must first clarify what is at issue regarding the tax status contention, which as stated in <u>Califano</u> referred to "the unique tax status of Puerto Rico [by which] its residents do not contribute to the public treasury," 435 U.S. at 5 n.7, a statement by the Court which Appellant rewrites in its brief as saying "that residents of Puerto Rico do not, as a general matter, pay federal income taxes." Appellant Br. 9.[11] This is not an insignificant typographical error, for in its muted attempt to alter the Court's accepted rationales in <u>Califano</u> and <u>Harris</u>, Appellant instead highlights a fundamental misconception in its tax argument. In trying to restrict the language that the Court used in <u>Califano</u> and <u>Harris</u> (which indicates by the actual text "do not contribute" to the federal treasury) to the limited coverage Appellant proposes (which only includes income tax contributions), Appellant may have unwittingly pointed to a fatal link in its armor as regards this factor, one which is pierced by

---

[11] We note that the Court in <u>Harris</u> did not include any qualifier and concluded curtly that "Puerto Rican residents do not contribute to the federal treasury." <u>Harris</u>, 446 U.S. at 652.

Appellee's argument pointing to the substantial contributions made by those who reside in Puerto Rico to the federal treasury.

The residents of Puerto Rico not only make substantial contributions to the federal treasury, but in fact have consistently made them in higher amounts than taxpayers in at least six states, as well as the territory of the Northern Mariana Islands.[12] From 1998 up until 2006, when Puerto Rico was hit by its present economic recession,[13] Puerto Rico consistently contributed more than $4 billion annually in federal taxes and impositions into the national fisc. See Internal Revenue Service, SOI Tax Stats - Gross Collections, by Type of Tax and State - IRS Data Book Table 5, available at https://www.irs.gov/statistics/soi-tax-stats-gross-collections-by-type-of-tax-and-state-irs-data-book-table-5 (last visited April 9, 2020). This is more than

---

[12] It should be noted that the U.S. citizens who reside in Puerto Rico, despite contributing to the national fisc, have no voting representation in the federal government. See Igartúa v. Trump, 868 F.3d 24 (1st Cir. 2017) (en banc); Igartúa-de la Rosa v. United States, 417 F.3d 145 (1st Cir. 2005) (en banc).

[13] A not insubstantial case can be made, correlating Puerto Rico's current recession at least in part with the lack of equitable federal funding of social and health benefits programs available to other Americans. See Juan R. Torruella, Commentary, Why Puerto Rico Does Not Need Further Experimentation with Its Future: A Reply to the Notion of "Territorial Federalism", 131 Harv. L. Rev. F. 65, 91-92 (2018) (explaining how local government has been forced to cover the healthcare funding shortfalls under Medicare and Medicaid to provide even minimal health benefits).

taxpayers in several of the states contributed, including Vermont, Wyoming, South Dakota, North Dakota, Montana, and Alaska, as well as the Northern Mariana Islands.  Id.  Even since 2006 to the present, and notwithstanding monumental economic problems [14] aggravated by catastrophic Hurricane María[15] and serious ongoing earthquakes,[16] Puerto Ricans continue to pay substantial sums into the federal treasury through the IRS:  $3,443,334,000 in 2018; $3,393,432,000 in 2017; $3,479,709,000 in 2016; . . . $4,036,334,000 in 1998.  Id.  Puerto Rico's contributions include the payment of federal income taxes by residents of Puerto Rico on income from sources outside Puerto Rico for which they are liable under the Internal Revenue Code, the regular payment of federal income taxes by all federal employees[17] in Puerto Rico, 26 U.S.C.

---

[14]  See Torruella, supra note 13, at 89; Laura Sullivan, How Puerto Rico's Debt Created a Perfect Storm Before the Storm, NPR (May 2, 2018, 7:10 AM), https://www.npr.org/2018/05/02/607032585/how-puerto-ricos-debt-created-a-perfect-storm-before-the-storm.

[15]  See Puerto Rico; Major Disaster and Related Determinations, 82 Fed. Reg. 46,820 (Oct. 6, 2017).

[16]  See Puerto Rico; Emergency and Related Determinations, 85 Fed. Reg. 6,965 (Feb. 6, 2020).

[17]  I.R.S., Tax Topic No. 901, Is a Person with Income from Puerto Rico Required to File a U.S. Federal Income Tax Return?, available at https://www.irs.gov/taxtopics/tc901 ("if you're a bona fide resident of Puerto Rico and a U.S. government employee, you must file a U.S. income tax return").  There are approximately 14,000 federal employees in Puerto Rico (as well as 9,550 retired federal employees), who are (or were) required to pay federal income taxes on local income.  Adriana De Jesús Salamán, U.S. Employees in

§ 933, as well as the full Social Security, Medicare, and Unemployment Compensation taxes that are paid in the rest of the United States, see 26 U.S.C. §§ 3101, 3111, 3121(e), 3301, 3306(j).[18]  That in 2018 the IRS collected approximately $3,443,334,000 from Puerto Rico taxpayers clearly undermines the contention that Puerto Rico residents do not contribute to the federal treasury.  There should be little doubt that, to the extent that there may have been a basis for it when Califano and Harris were decided, the argument that Puerto Rico's residents do not contribute to the federal treasury is no longer available.

Minding that Appellant has narrowed its argument to the non-payment of federal income tax, there is an additional powerful argument that undermines Appellant's position.  Appellant claims that "[i]t is rational for Congress to limit the SSI program benefits, funded by general revenues, to exclude populations that generally do not pay federal income taxes."  And "residents of Puerto Rico generally do not pay federal income tax[es]."  No

_Puerto Rico and Territories Face Huge Pay Gap_, Noticel (May 17, 2019, 10:37 AM), https://www.noticel.com/english/us-employees-in-puerto-rico-and-territories-face-huge-pay-gap/1078602168.

[18]  Generally, federal employment taxes apply to residents of Puerto Rico on the same basis and for the same sources of income as to the residents of the states.  See id.; Sean Lowry, Cong. Research Serv., R44651, Tax Policy and U.S. Territories: Overview and Issues for Congress 8-9 (2016).

-28-

matter "that Congress could have drawn a connection between a particular State's contribution to the federal treasury," Appellant posits, because the Constitution is not offended "simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" Dandridge, 397 U.S. at 485 (quoting Lindsley v. Nat. Carbonic Gas Co., 220 U.S. 61, 78 (1911)). In response, Appellee argues that "the tax status of Puerto Rico . . . bears no relation to the exclusion of Puerto Rico residents from SSI under the program's own criteria." He points out that SSI eligibility is completely "divorced from individuals' tax payment history" and that "any individual with earnings low enough to qualify for SSI will not be paying federal income tax regardless of where they reside." In addition, SSI is a national program distributed according to a uniform federal schedule, funded by appropriations that are not earmarked by state or territory, and disbursed regardless of an individual's historical residence.

Appellant asks us to turn to Dandridge, where the Supreme Court upheld Maryland's adoption of a "maximum grant regulation" whereby it limited the amount of AFDC aid any one family unit could receive, resulting in a "reduc[tion of] the per capita benefits to the children in the largest families." Id. at 477, 487. The Court accepted the following rationalizations:

> It is enough that a solid foundation for the
> regulation can be found in the State's legitimate
> interest in encouraging employment and in avoiding
> discrimination between welfare families and the
> families of the working poor. By combining a limit
> on the recipient's grant with permission to retain
> money earned, without reduction in the amount of the
> grant, Maryland provides an incentive to seek gainful
> employment. And by keying the maximum family AFDC
> grants to the minimum wage a steadily employed head
> of a household receives, the State maintains some
> semblance of an equitable balance between families on
> welfare and those supported by an employed
> breadwinner.

Id. at 486 (footnote omitted).[19] The Court conceded that there might be some instances where the incentive to seek gainful employment would not function perfectly, "[b]ut the Equal Protection Clause [did] not require that a State . . . choose between attacking every aspect of a problem or not attacking the problem at all," the problem presumably being how to incentivize recipients of AFDC to seek gainful employment. Id. at 486-87 (citing Lindsley, 220 U.S. 61). Putting Dandridge's holding in context, it becomes less clear that it supports Appellant's position -- that Congress's decision to exempt Puerto Rico residents from paying income taxes on income derived from sources within Puerto Rico (except when that source is employment by the

---

[19] The Court did not address Maryland's two additional arguments for its maximum grant regulations: to provide incentives for family planning and to allocate available public funds to meet the needs of the largest possible number of families. Id. at 484, 486.

-30-

federal government), see 26 U.S.C. § 933, justifies the categorical exclusion of low income, poorly resourced elderly, disabled, and blind individuals residing in Puerto Rico. Construing the Appellant's argument in the terms of Dandridge, it would seem that the legitimate interest the government is furthering by excluding from SSI a class of individuals whose local income is "generally" exempted from federal income taxes (but who could only be earning less than prescribed by SSI's income limits) is that SSI recipients should be financing their own benefits. This makes little sense in the context of SSI, a program of last resort. See 42 U.S.C. § 1382(e)(2) (requiring those seeking SSI to apply for every other source of income to which they may be entitled).

We are unaware of, and Appellant fails to point to, any instance where the government has justified the exclusion of a class of people from welfare payments (which are untied to income tax receipts) because they do not pay federal income tax. Cf. Zobel v. Williams, 457 U.S. 55, 63 (1982) ("Appellants' reasoning would . . . permit the State to apportion all benefits and services according to the past tax [or intangible] contributions of its citizens. The Equal Protection Clause prohibits such an apportionment of state services." (emphasis in original) (quoting Shapiro v. Thompson, 394 U.S. 618, 632-33 (1969))).[20] As

---

[20] Explicitly applying rationality review, the Court in Zobel

recognized by the Court in Shapiro, the sort of welfare benefits at issue here are distinguishable from federal insurance programs, like Social Security Disability Insurance, which "may legitimately tie the amount of benefits [awarded] to the individual's contributions." 394 U.S. at 633 n.10.[21] See H.R. Rep. No. 92-231, at 146-47 (1971) ("[C]ontributory social insurance should continue to be relied on as the basic means of replacing earnings that have been lost as a result of old age, disability, or blindness. But some people who because of age, disability, or blindness are not able to support themselves through work may receive relatively small social security benefits . . . [which] therefore, must be complemented by an effective assistance program."). However, because SSI is a means-tested program, by its very terms, only low-income individuals lacking in monetary resources are eligible for the program. For example, as pointed out by Amicus Resident

---

invalidated a government scheme distributing monetary benefits which were based on the length of residency in the state, rejecting as impermissible the state's argument that the scheme was justified by "past contributions" to the state. Id. at 60-61, 63; see also id. at 71 (Brennan, J., concurring) ("[T]he relationship between residence and contribution to the State [is] so vague and insupportable, that it amounts to little more than a restatement of the criterion for the discrimination it purports to justify.").

[21] We cite Shapiro for this limited premise noting that we are acutely aware that the Court views the situation here differently from that in Shapiro, see Califano, 435 U.S. at 4-5, which dealt with classifications that burdened the fundamental right to interstate travel. Shapiro, 394 U.S. at 629-30.

Commissioner of Puerto Rico, to be eligible in fiscal year 2015, an individual could not make more than $733 of countable income a month, or $1100 in the case of a couple.[22] Consequently, any individual eligible for SSI benefits almost by definition earns too little to be paying federal income taxes.[23] Thus, the idea that one needs to earn their eligibility by the payment of federal income tax is antithetical to the entire premise of the program. How can it be rational for Congress to limit SSI benefits "to exclude populations that generally do not pay federal income taxes" when the very population those benefits target do not, as a general matter, pay federal income tax?

Appellee's arguments, as we understand them, are not restricted to the notion that the lines as drawn are "imperfect," that there will be some leakage, i.e., people who do not pay (or have not paid) federal income taxes receiving these benefits and

---

[22] See Amicus Curiae Hon. Jenniffer González Colón Br. 26 (citing William R. Morton, Cong. Research Serv., Cash Assistance for the Aged, Blind, and Disabled in Puerto Rico 11 (2016) [hereinafter CRS Report]). The calculation excludes the first $20 of any income, and the first $65 of earned income plus half of any labor earnings over $65. Id. The resource limit, which has not changed since 1989, is $2,000 for individuals and $3,000 for couples. 42 U.S.C. §§ 1382(a)(3)(A)-(B).

[23] At present, the standard deduction is $12,400 for single tax filers, I.R.C. §§ 63(c)(2)(C), 63(c)(7)(A)(ii), and it is higher for those who are blind and elderly, see id. §§ 63(c)(3), 63(f)(1)(A), 63(f)(2).

others who do pay federal taxes that will be categorically denied,[24] but rather that a "sufficiently close nexus with underlying policy objectives to be used as the test for eligibility" is entirely lacking. Weinberger, 422 U.S. at 772, 784-85 (upholding a nine-month marriage requirement for eligibility to receive a deceased spouse's benefits as rationally related to the government's legitimate interest in combatting fraud). The problem with this categorical exclusion is not that it is drawn without "mathematical nicety," Moreno, 413 U.S. at 538 (citing Dandridge, 397 U.S. at 485), but "wholly without any rational basis," id.[25]

**2.**

Having found the tax status argument irrational and arbitrary, we thus come to Appellant's remaining argument: the claim that the cost of including Puerto Rico residents in the SSI program is a rational basis for their exclusion.

---

[24] Nevertheless, the incongruity of Appellant's arguments becomes more patent when one considers that if a resident of Puerto Rico moves, say to New York, he or she becomes eligible to receive SSI benefits upon establishing residence in that state for thirty consecutive days, 42 U.S.C. § 1382, yet Appellee, who presumably was required to pay federal income taxes during his quarter century residency in New York, loses his SSI benefits solely because he moves to Puerto Rico.

[25] While Appellant decries any reliance on Moreno because it predates Califano and Harris, as we have explained, the Court in those latter cases was not tasked with reviewing on equal protection grounds the rationality of excluding otherwise eligible Puerto Rico residents from SSI.

As Appellant posits and we accept, "Congress has wide latitude to create classifications that allocate noncontractual benefits under a social welfare program," Califano v. Goldfarb, 430 U.S. 199, 210 (1977), and "protecting the fiscal integrity of Government programs, and of the Government as a whole, 'is a legitimate concern of the State,'" Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW, 485 U.S. 360, 373 (1988) (quoting Ohio Bureau of Emp't. Servs. v. Hodory, 431 U.S. 471, 493 (1977)). In Lyng, the Court upheld an amendment to the Food Stamp Act which barred households from becoming eligible for food stamps if a member of the household was on strike and prevented an increase in food stamps because the striker's income had decreased. Id. The government presented three objectives served by the challenged statute, and the Court focused primarily on Congress's "concern that the food stamp program was being used to provide one-sided support for labor strikes," which had "damaged the program's public integrity." Id. at 371 (first citing then quoting S. Rep. No. 97-139, p. 62 (1981)). The Court noted "Congress' considered efforts" to achieve its stated goal of maintaining neutrality in private labor disputes as evidenced by tailoring the statute to not strip eligibility from those who were previously eligible for food stamps and who refused to accept employment on account of a strike. Id. at 372. Only after finding

-35-

the statute rational did the Court address the question of cost-saving for the federal government, qualifying its analysis that "Congress can[not] pursue the objective of saving money by discriminating against individuals or groups."  Id. at 373; see also Hodory, 431 U.S. at 493 ("We need not consider whether it would be 'rational' for the State to protect the fund through a random means, such as elimination from coverage of all persons with an odd number of letters in their surnames.  Here, the limitation of liability tracks the reasons found rational above, and the need for such limitation unquestionably provides the legitimate state interest required by the equal protection equation.").

We respect that "[f]iscal considerations may compel certain difficult choices in order to improve the protection afforded to the entire benefited class."  Lyng, 485 U.S. at 373 (quoting Harris v. McRae, 448 U.S. 297, 355 (1980) (Stevens, J., dissenting)).  And that when coupled with a classification rationally drawn to further some constitutionally permissible state interest, cost-savings are certainly allowed to play into the legislature's calculations, and we are not in a position to second-guess those decisions.  See Bowen v. Gillard, 483 U.S. 587, 599 (1987) (finding the AFDC amendment served Congress's goal of decreasing federal expenditures and distributing benefits fairly

through "identif[ication of] a group that would suffer less than others as a result of a reduction in benefits").  Cf. Shapiro, 394 U.S. at 633 (explaining that while fiscal integrity is a valid state interest, a state "may not accomplish such a purpose by . . . reduc[ing] expenditures for education by barring indigent children from its schools").[26]

In response to Appellee's argument that if costs alone justify exclusion then "Congress could arbitrarily exclude the residents of any State or municipality to reduce cost," Appellant concedes "there may be other constraints, legal or political, on Congress's ability to enact a statute excluding residents of a particular State from a benefits program [but] that does not mean that cost to the public fisc is not itself a rational consideration."  What Appellant plainly fails to grapple with is that cost alone does not support differentiating individuals.  If it did, how would Congress be able to decide upon whom to bestow benefits?  Presumably along the lines of its legislative priorities which, at a minimum, must be supported by some conceivable rational explanation.  The circularity of this logic defeats itself.

---

[26]  A reminder that according to the Court, just like Puerto Rico residency, indigency does not warrant any form of heightened review.  See McRae, 448 U.S. at 323.

The contention that decisions based on fiscal considerations that "improve the protection afforded to the entire benefitted class" and thus should be subject to deference is inapplicable to the situation before us, where an entire segment of the would-be benefitted class is excluded. Lyng, 485 U.S. at 373. See Jefferson, 406 U.S. at 549 (finding that the state did not violate equal protection when it reduced funding for AFDC compared to other categorical assistance programs because it was "not irrational for the [s]tate to believe that the young are more adaptable than the sick and elderly" with better prospects for improving their lot). Even in Jefferson the Court recognized some legitimate state priority other than minding the public fisc. Id. In fact, this contention begs the question of how Congress, supposedly aiming for fiscal integrity, has chosen to protect the poor elderly, blind, and disabled residents of Puerto Rico, and we turn our attention briefly to the Aid to the Aged, Blind, and Disabled (AABD) program, 42 U.S.C. §§ 1381 note - 1385 note (Provisions applicable to Puerto Rico, Guam, and the Virgin Islands), operating in Puerto Rico.

After Congress enacted the Social Security Act Amendments of 1950, Puerto Rico submitted state plans to participate in programs for Old-Age Assistance, Aid to the Blind, and Aid to the Permanently and Totally Disabled, which were

consolidated into AABD in 1963.  See CRS Report, supra at 14-15.
Passed in its current form in 1972, SSI replaced these adult
assistance programs in the states and Washington, D.C.; however,
its predecessor AABD continues to operate in Puerto Rico.  Id. at
15; see Social Security Amendments of 1972, Pub. L. No. 92-603,
§ 301, 86 Stat. 1329, 1465 (1972).  AABD is financed by a capped
categorical matching grant whereby the federal government
contributes 75 percent and the territorial government contributes
25 percent; administrative costs are split 50/50.  CRS Report,
supra at 12.  Like SSI, federal funds for AABD flow (or maybe more
accurately trickle) from the general fund of the U.S. treasury.
Id.  During fiscal year 2011, the average AABD monthly payment was
$73.85, compared to SSI payments of $438.05 in the fifty states
and the District of Columbia and $525.69 in the Northern Mariana
Islands.  Id. at 21.  In fiscal year 2011, 34,401 individuals in
Puerto Rico were enrolled in the AABD program.  Id.  The
Government Accountability Office has predicted that, had Puerto
Rico been extended SSI at that time, 305,000 to 354,000 eligible
Puerto Rico residents would have received SSI.  See U.S. Gov't
Accountability Off., GAO-14-31, Puerto Rico: Information on How
Statehood Would Potentially Affect Selected Federal Programs and
Revenue Sources 82 (2014).[27]  While the disparity in the benefits

---

[27]  While the categorical requirements for age, blindness, and

-39-

received by the poor elderly, disabled, and blind in Puerto Rico compared to similarly situated individuals residing elsewhere in the United States speaks for itself, it is worth pointing out that the funds supporting AABD are also paid out of by the federal treasury.

Therefore, while we respect the legislature's authority to make even unwise decisions to purportedly protect the fiscal integrity of SSI and the federal government itself, the Fifth Amendment does not permit the arbitrary treatment of individuals who would otherwise qualify for SSI but for their residency in Puerto Rico (those plausibly considered least able to "bear the hardships of an inadequate standard of living").  Jefferson, 406 U.S. at 549.  See Carolene Prods. Co., 304 U.S. at 152 n.4 (noting that "prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry").  Even under rational basis review, the cost of including Puerto Rico's elderly, disabled, and blind in SSI cannot by itself justify their exclusion.

---

disability are almost identical between the two programs, the income limit to qualify for AABD is substantially lower.  CRS Report, supra at 11.

**3.**

Finally, while the inclusion of the Northern Mariana Islands in the SSI program does not standing alone render the discriminatory treatment of Appellee per se irrational, see Baker, 916 F.2d at 747, the fact that Congress extended SSI benefits to the residents of the Northern Mariana Islands as part of the Islands' covenant to enter the United States undercuts the Appellant's only offered explanations for the exclusion. Aside from where they live, the otherwise SSI-qualifying residents of Puerto Rico and of the Northern Mariana Islands have the legally-relevant characteristics in common, i.e., they are (1) low-income and low-resourced, (2) elderly, disabled, or blind, and (3) generally exempted from paying federal income tax.[28] These shared traits undermine Appellant's already weakened arguments.

In addition, as to Appellant's contention that the inclusion of Northern Mariana Islands residents in the SSI program "pre-dated both Califano and Harris, and in neither case did the Supreme Court suggest that it undermined Congress's rationality," we refer to our earlier point regarding the limited holding of

---

[28] We note that unlike residents of Puerto Rico, who are required to pay federal taxes on all income earned outside of Puerto Rico, the Northern Mariana Islands government retains all taxes paid by its bona fide residents regardless of the income source. See 26 U.S.C. § 931(a); Lowry, supra note 16, at 23.

those cases.  In neither case was the inclusion of Northern Mariana Islands residents in the SSI program brought to the Court's attention; it went unmentioned and would have been irrelevant to the district court opinions in Califano (holding that the exclusion from SSI violated the plaintiff's right to travel) and in Harris (finding that the less favorable reimbursement formula and ceiling for AFDC violated the plaintiffs' equal protection rights).

Finally, Appellant declares that "[t]here is no 'equal footing doctrine'" in an effort to negate any comparison of Puerto Rico residents to those living in Northern Mariana Islands.  But its citations belie the validity of its arguments given the present situation.  For example, Appellant cites Palmore v. United States, 411 U.S. 389, 402-03 (1973), for the proposition that "Congress may legislate differently for the territories than for the states, and differently for one territory than for another."  But the reference is inapt: in upholding a defendant's conviction decided by a Congressionally-created non-Article III court in the District of Columbia, the Court in Palmore did not opine on Congress's disparate treatment of territorial residents.  Rather, the Supreme Court examined only "the question of whether Palmore was entitled to be tried by a court ordained and established in accordance with" Article III.  Palmore, 411 U.S. at 396-97.  The Court held that the Constitution did not foreclose Palmore's trial before a

-42-

non-Article III judge because Article III's requirements apply "where law of national applicability and affairs of national concern are at stake."  Id. at 408.  To that end, "neither th[e] [Supreme] Court nor Congress has read the Constitution as requiring every federal question arising under federal law, or even every criminal prosecution for violating an Act of Congress, to be tried in an Art. III court," so Congress was permitted to "create[] a wholly separate court system designed primarily to concern itself with local law and to serve as a local court system . . . ."  Id. at 407-08.  Palmore therefore stands for the proposition that non-Article III territorial courts have historically, and permissibly, "tried criminal cases arising under the general laws of Congress, as well as those brought under territorial laws."  Id. at 403.  We think it important to note that the effect of the Court's holding was to render the Palmore defendant's "position . . . similar to that of the citizen of any of the 50 States when charged with violation of a state criminal law: Neither has a federal constitutional right to be tried before judges with tenure and salary guarantees."  Id. at 390-91 (emphasis added).

We therefore decline to read Palmore's holding so broadly as to permit Congress to sidestep the Fifth Amendment when it legislates for a territory.  Article III did not obstruct Congress's power to create -- under its Article I, section 8,

-43-

clause 17 authority -- the local court system that convicted Palmore. By contrast, Appellant points us to no authority suggesting that the Fifth Amendment's equal protection guarantees should likewise stand aside in this case. So, for the reasons explained throughout this opinion, we hold that the Fifth Amendment forbids the arbitrary denial of SSI benefits to residents of Puerto Rico.

The relevance of Appellant's citation to Tuaua v. United States is similarly flawed. 788 F.3d 300, 310 (D.C. Cir. 2015) (declining to forcibly impose birthright citizenship over the opposition of American Samoa's majoritarian will reflected in its democratically-elected government because it would be "impractical and anomalous at a fundamental level"). The D.C. Circuit clarified that its holding was restricted to the controversy before it where the territorial government had intervened in the lawsuit against birthright citizenship. Id. at 310 n.10. The D.C. Circuit "h[e]ld it anomalous to impose citizenship over the objections of the American Samoan people themselves, as expressed through their democratically elected representatives." Id. at 310. This case presents no such anomaly. Cf. Commonwealth of Puerto Rico Amicus Br. (arguing unequivocally that SSI should be extended to Puerto Rico residents).

### III. Conclusion

The categorical exclusion of otherwise eligible Puerto Rico residents from SSI is not rationally related to a legitimate government interest. In addition to the record established by the parties, we have considered even conceivable theoretical reasons for the differential treatment conceded by the government. Having found no set of facts, nor Appellant having alleged any additional theory, establishing a rational basis for the exclusion of Puerto Rico residents from SSI coverage, such exclusion of the residents of Puerto Rico is declared invalid. For the foregoing reasons, we affirm the district court's grant of Appellee's motion for summary judgment and the denial of the United States' cross motion for summary judgment.

**<u>Affirmed</u>**.