4/28/2022 11:25:00 AM

# Compare Results

Old File:

**20-303.pdf**

**43 pages (240 KB)**

4/19/2022 3:47:28 PM

versus

New File:

**20-303_new.pdf**

**43 pages (273 KB)**

4/28/2022 11:24:19 AM

**Total Changes**

1

**Content**

1    Replacement

0    Insertions

0    Deletions

**Styling and Annotations**

0    Styling

0    Annotations

Go to First Change (page 40)

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* VAELLO MADERO

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 20–303. Argued November 9, 2021—Decided April 21, 2022

The Territory Clause of the United States Constitution—which states that Congress may "make all needful Rules and Regulations respecting the Territory . . . belonging to the United States," Art. IV, §3, cl. 2— affords Congress broad authority to legislate with respect to the U. S. Territories. In exercising that authority, Congress has long maintained different federal tax and benefits programs for residents of the Territories than for residents of the 50 States. For example, residents of Puerto Rico are typically exempt from most federal income, gift, estate, and excise taxes. See 48 U. S. C. §734; see, *e.g.,* 26 U. S. C. §§933, 2209, 4081–4084. But just as not every federal tax extends to residents of Puerto Rico, so too not every federal benefits program extends to residents of Puerto Rico. One such benefits program is Supplemental Security Income (SSI), which by statute applies only to residents of the 50 States and the District of Columbia. 42 U. S. C. §1382c(a)(1)(B)(i). The question presented is whether the equal-protection component of the Fifth Amendment's Due Process Clause requires Congress to make Supplemental Security Income benefits available to residents of Puerto Rico to the same extent that Congress makes those benefits available to residents of the States.

Here, respondent Jose Luis Vaello Madero received SSI benefits while he was a resident of New York. He then moved to Puerto Rico, where he was no longer eligible to receive those benefits. Unaware of Vaello Madero's new residence, the Government continued to pay him SSI benefits. The Government eventually sued Vaello Madero to recover those errant payments, which totaled more than $28,000. In response, Vaello Madero invoked the Constitution, arguing that Congress's exclusion of residents of Puerto Rico from the SSI program violated the equal-protection component of the Fifth Amendment's

Due Process Clause.  The District Court and the Court of Appeals agreed.

*Held*: The Constitution does not require Congress to extend SSI benefits to residents of Puerto Rico.  In *Califano* v. *Torres,* 435 U. S. 1, and *Harris* v. *Rosario,* 446 U. S. 651, the Court applied the deferential rational-basis test to uphold Congress's decision not to extend certain federal benefits to Puerto Rico, noting that because Congress chose to treat residents of Puerto Rico differently from residents of the States for purposes of tax laws, it could do the same for benefits programs.  Those two precedents dictate the result here.  Congress's decision to exempt Puerto Rico's residents from most federal income, gift, estate, and excise taxes supplies a rational basis for likewise distinguishing residents of Puerto Rico from residents of the States for purposes of the SSI benefits program.  Vaello Madero's contrary position would usher in potentially far-reaching consequences, with serious implications for the Puerto Rican people and the Puerto Rican economy.  The Constitution does not require that extreme outcome.  Pp. 4–6.

956 F. 3d 12, reversed.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, BREYER, ALITO, KAGAN, GORSUCH, and BARRETT, JJ., joined.  THOMAS, J., and GORSUCH, J., filed concurring opinions.  SOTOMAYOR, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order that
corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 20–303

## UNITED STATES, PETITIONER *v.* JOSE LUIS VAELLO MADERO

*ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT*

[April 21, 2022]

JUSTICE KAVANAUGH delivered the opinion of the Court.

The United States includes five Territories: American Sa-moa, Guam, the Northern Mariana Islands, the U. S. Virgin Islands, and Puerto Rico. This case involves Puerto Rico, which became a U. S. Territory in 1898 in the wake of the Spanish-American War.

For various historical and policy reasons, including local autonomy, Congress has not required residents of Puerto Rico to pay most federal income, gift, estate, and excise taxes. Congress has likewise not extended certain federal benefits programs to residents of Puerto Rico.

The question presented is whether the equal-protection component of the Fifth Amendment's Due Process Clause requires Congress to make Supplemental Security Income benefits available to residents of Puerto Rico to the same extent that Congress makes those benefits available to res-idents of the States. In light of the text of the Constitution, longstanding historical practice, and this Court's prece-dents, the answer is no.

\*          \*          \*

The Territory Clause of the Constitution states that Congress may "make all needful Rules and Regulations respecting the Territory . . . belonging to the United States." Art. IV, §3, cl. 2. The text of the Clause affords Congress broad authority to legislate with respect to the U. S. Territories.

Exercising that authority, Congress sometimes legislates differently with respect to the Territories, including Puerto Rico, than it does with respect to the States. That longstanding congressional practice reflects both national and local considerations. In tackling the many facets of territorial governance, Congress must make numerous policy judgments that account not only for the needs of the United States as a whole but also for (among other things) the unique histories, economic conditions, social circumstances, independent policy views, and relative autonomy of the individual Territories.

Of relevance here, Congress must decide how to structure federal taxes and benefits for residents of the Territories. In doing so, Congress has long maintained federal tax and benefits programs for residents of Puerto Rico and the other Territories that differ in some respects from the federal tax and benefits programs for residents of the 50 States.

On the tax side, for example, residents of Puerto Rico are typically exempt from most federal income, gift, estate, and excise taxes. See 39 Stat. 954, as amended, 48 U. S. C. §734; see, *e.g.*, 26 U. S. C. §§933, 2209, 4081–4084. At the same time, residents of Puerto Rico generally pay Social Security, Medicare, and unemployment taxes. 26 U. S. C. §§3121(e), 3306(j).

On the benefits side, residents of Puerto Rico are eligible for Social Security and Medicare. §3121(e); 42 U. S. C. §§410(h)–(i), 1301(a)(1). Residents of Puerto Rico are also eligible for federal unemployment benefits. 26 U. S. C. §3306(j); see also House Committee on Ways and Means,

Green Book: Background Material and Data on the Programs Within the Jurisdiction of the Committee on Ways and Means, App. A (24th ed. 2018).

But just as not every federal tax extends to residents of Puerto Rico, so too not every federal benefits program extends to residents of Puerto Rico. One example is the Supplemental Security Income program, which Congress passed and President Nixon signed into law in 1972. 86 Stat. 1465. The Supplemental Security Income program provides benefits for, among others, those who are age 65 or older and cannot financially support themselves.

To be eligible for Supplemental Security Income, an individual must be a "resident of the United States," 42 U. S. C. §1382c(a)(1)(B)(i), which the statute defines as the 50 States and the District of Columbia, §1382c(e). A later statute included residents of the Northern Mariana Islands in the program. Note following 48 U. S. C. §1801; 90 Stat. 268. But residents of Puerto Rico are not eligible for Supplemental Security Income. Instead, the Federal Government provides supplemental income assistance to covered residents of Puerto Rico through a different benefits program—one that is funded in part by the Federal Government and in part by Puerto Rico. Notes following §§1381−1385.

The dispute in this case concerns a claim for Supplemental Security Income benefits by a resident of Puerto Rico named Jose Luis Vaello Madero. In 2013, Vaello Madero moved from New York to Puerto Rico. While he lived in New York, Vaello Madero received Supplemental Security Income benefits. After moving to Puerto Rico, Vaello Madero no longer was eligible for Supplemental Security Income benefits. Yet for several years, the U. S. Government remained unaware of Vaello Madero's new residence and continued to pay him benefits. The overpayment totaled more than $28,000.

Seeking to recover those errant payments, the U. S. Government sued Vaello Madero for restitution. In response,

Vaello Madero invoked the U. S. Constitution. Vaello Madero argued that Congress's exclusion of residents of Puerto Rico from the Supplemental Security Income program violated the equal-protection component of the Fifth Amendment's Due Process Clause.

Vaello Madero's constitutional argument prevailed in the District Court and the Court of Appeals, 956 F. 3d 12 (CA1 2020), and we granted certiorari, 592 U. S. ___ (2021). We respectfully disagree with those Courts. In our view, this Court's precedents, in addition to the constitutional text and historical practice discussed above, establish that Congress may distinguish the Territories from the States in tax and benefits programs such as Supplemental Security Income, so long as Congress has a rational basis for doing so.

In *Califano* v. *Torres*, the Court addressed whether Congress's decision not to extend Supplemental Security Income to Puerto Rico violated the constitutional right to interstate travel. 435 U. S. 1 (1978) (*per curiam*). Applying the deferential rational-basis test, the Court upheld Congress's decision. The Court explained that Congress had exempted residents of Puerto Rico from federal taxes. And the Court concluded that Congress could likewise treat residents of Puerto Rico differently from residents of the States in the Supplemental Security Income benefits program. *Id.*, at 3–5, and n. 7.

A few years later, in *Harris* v. *Rosario*, the Court again ruled that Congress's differential treatment of Puerto Rico in a federal benefits program did not violate the Constitution—this time, the equal-protection component of the Fifth Amendment's Due Process Clause. 446 U. S. 651 (1980) (*per curiam*). The Court stated that the Territory Clause permits Congress to "treat Puerto Rico differently from States so long as there is a rational basis for its actions." *Id.*, at 651−652. Citing the prior decision in *Torres*, the Court noted that Congress's tax laws treated residents of Puerto Rico differently from residents of the States. And

the Court concluded that Congress could do the same for that benefits program. 446 U. S., at 651–652.

Those two precedents dictate the result here. The deferential rational-basis test applies. And Puerto Rico's *tax* status—in particular, the fact that residents of Puerto Rico are typically exempt from most federal income, gift, estate, and excise taxes—supplies a rational basis for likewise distinguishing residents of Puerto Rico from residents of the States for purposes of the Supplemental Security Income *benefits* program. See *Torres*, 435 U. S., at 5, n. 7; *Rosario*, 446 U. S., at 652. In devising tax and benefits programs, it is reasonable for Congress to take account of the general balance of benefits to and burdens on the residents of Puerto Rico. In doing so, Congress need not conduct a dollar-to-dollar comparison of how its tax and benefits programs apply in the States as compared to the Territories, either at the individual or collective level. See *Torres*, 435 U. S., at 3–5, and n. 7; *Rosario*, 446 U. S., at 652. Congress need only have a rational basis for its tax and benefits programs. Congress has satisfied that requirement here.

Moreover, Vaello Madero's position would usher in potentially far-reaching consequences. For one, Congress would presumably need to extend not just Supplemental Security Income but also many other federal benefits programs to residents of the Territories in the same way that those programs cover residents of the States. And if this Court were to require identical treatment on the benefits side, residents of the States could presumably insist that federal *taxes* be imposed on residents of Puerto Rico and other Territories in the same way that those taxes are imposed on residents of the States. Doing that, however, would inflict significant new financial burdens on residents of Puerto Rico, with serious implications for the Puerto Rican people and the Puerto Rican economy. The Constitution does not

require that extreme outcome.*

\*     \*     \*

The Constitution affords Congress substantial discretion over how to structure federal tax and benefits programs for residents of the Territories.  Exercising that discretion, Congress *may* extend Supplemental Security Income benefits to residents of Puerto Rico.  Indeed, the Solicitor General has informed the Court that the President supports such legislation as a matter of policy.  But the limited question before this Court is whether, under the Constitution, Congress *must* extend Supplemental Security Income to residents of Puerto Rico to the same extent as to residents of the States.  The answer is no.  We therefore reverse the judgment of the U. S. Court of Appeals for the First Circuit.

*It is so ordered.*

—————

*The Court's decision today should not be read to imply that Congress may exclude residents of individual States from benefits programs.  Congress has not done so, and that question is not presented in this case.

# SUPREME COURT OF THE UNITED STATES

No. 20–303

UNITED STATES, PETITIONER *v.*
JOSE LUIS VAELLO MADERO

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[April 21, 2022]

JUSTICE THOMAS, concurring.

I join the opinion of the Court. I write separately to address the premise that the Due Process Clause of the Fifth Amendment contains an equal protection component whose substance is "precisely the same" as the Equal Protection Clause of the Fourteenth Amendment. *Weinberger* v. *Wiesenfeld*, 420 U. S. 636, 638, n. 2 (1975). Although I have joined the Court in applying this doctrine, see *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 213–217 (1995), I now doubt whether it comports with the original meaning of the Constitution. Firmer ground for prohibiting the Federal Government from discriminating on the basis of race, at least with respect to civil rights, may well be found in the Fourteenth Amendment's Citizenship Clause.

## I

Until the middle of the 20th century, this Court consistently recognized that the Fifth Amendment "contains no equal protection clause and it provides no guaranty against discriminatory legislation by Congress." *Detroit Bank* v. *United States*, 317 U. S. 329, 337 (1943); see also *LaBelle Iron Works* v. *United States*, 256 U. S. 377, 392 (1921). However, the Court did maintain that the Fifth Amendment's Due Process Clause prohibited "such discriminatory

legislation by Congress as amounts to a denial of due pro-
cess," *i.e.,* legislation that would fail rational-basis review.
*Hirabayashi* v. *United States*, 320 U. S. 81, 100, 102 (1943).

In *Bolling* v. *Sharpe*, 347 U. S. 497 (1954), the Court be-
gan in earnest to fold an "equal protection" guarantee into
the concept of "due process." Decided the same day as
*Brown* v. *Board of Education*, 347 U. S. 483 (1954), *Bolling*
confronted the constitutionality of government-imposed
segregation in the District of Columbia's public schools. Be-
cause any such segregation was attributable to Congress,
see U. S. Const., Art. I, §8, cl. 17, rather than state action,
the Equal Protection Clause did not apply. *Bolling* instead
read an equal protection principle into the Fifth Amend-
ment's requirement that "[n]o person shall . . . be deprived
of life, liberty, or property, without due process of law." See
347 U. S., at 498–500.

*Bolling*'s locating of an equal protection guarantee in the
Fifth Amendment's Due Process Clause raises substantial
questions. First, *Bolling*'s interpretation seemingly relies
upon the *Lochner*-era theory that "unreasonable discrimi-
nation" is "a denial of due process of law." 347 U. S., at 499
(citing *Buchanan* v. *Warley*, 245 U. S. 60 (1917)); see also
347 U. S.*,* at 500 ("Segregation in public education is not
reasonably related to any proper governmental objective"
and therefore "constitutes an arbitrary deprivation of . . .
liberty"); see *Lochner* v. *New York*, 198 U. S. 45 (1905). By
invoking "due process" to hold an allegedly "unreasonable"
or "arbitrary" legislative classification unconstitutional,
*Bolling* made clear that it was applying this Court's "sub-
stantive due process" doctrine. See N. Chapman &
M. McConnell, Due Process as Separation of Powers, 121
Yale L. J. 1672, 1800 (2012) ("[W]hen the Court purports to
evaluate whether a state's interest is 'legitimate' or a 'jus-
tif[ied]' interference with a judge-made liberty, the result is
no different in principle than in other modern substantive
due process cases").

But "[t]he notion that a constitutional provision that guarantees only 'process' before a person is deprived of life, liberty, or property could define the substance of those rights strains credulity for even the most casual user of words." *McDonald* v. *Chicago*, 561 U. S. 742, 811 (2010) (THOMAS, J., concurring in part and concurring in judgment). Rather, "'considerable historical evidence supports the position that "due process of law" was a separation-of-powers concept designed as a safeguard against unlicensed executive action, forbidding only deprivations not authorized by legislation or common law.'" *Johnson* v. *United States*, 576 U. S. 591, 623 (2015) (THOMAS, J., concurring in judgment) (quoting D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789–1888, p. 272 (1985)); see also *In re Winship*, 397 U. S. 358, 378–382 (1970) (Black, J., dissenting). And, to the extent that the Due Process Clause restrains the authority of Congress, it may, at most, prohibit Congress from authorizing the deprivation of a person's life, liberty, or property without providing him the "customary procedures to which freemen were entitled by the old law of England." *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1, 28 (1991) (Scalia, J., concurring in judgment) (internal quotation marks omitted); see also *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272 (1856). Either way, the Fifth Amendment's text and history provide little support for modern substantive due process doctrine.

To be sure, some have argued that "antebellum due process theory commonly included an equality principle" that circumscribed legislative authority. K. Lash, Enforcing the Rights of Due Process, 106 Geo. L. J. 1389, 1443 (2018). But there is no historical consensus that this kind of substantive due process took hold in antebellum America. See, *e.g.,* I. Wurman, The Second Founding 28–35 (2020). And, in any event, "the pre-constitutional and Founding-era evidence regarding the meaning of 'due process of law' strongly

suggests the phrase most likely would have been viewed in
1791 . . . as guaranteeing either that duly enacted law
would be followed or that certain requisite procedures
would be observed." R. Williams, The One and Only Sub-
stantive Due Process Clause, 120 Yale L. J. 408, 416 (2010).
It is not clear why post-1791 developments should displace
more probative preconstitutional and founding-era evi-
dence. See, *e.g.,* S. Calabresi & S. Prakash, The President's
Power To Execute the Laws, 104 Yale L. J. 541, 550–551
(1994) ("[T]he Constitution's postenactment 'legislative'
history" is "the history that is least likely to reflect the orig-
inal understanding").

Second, *Bolling* reasoned that the "liberty" protected by
the Due Process Clause covers "the full range of conduct
which the individual is free to pursue," 347 U. S.*,* at 499–
500, and therefore guaranteed freedom from segregated
schooling. That understanding of "liberty" likely sweeps too
broadly. Given the relevant history, "it is hard to see how
the 'liberty' protected by the [Due Process Clause] could be
interpreted to include anything broader than freedom from
physical restraint." *Obergefell* v. *Hodges*, 576 U. S. 644, 725
(2015) (THOMAS, J., dissenting). And even if "liberty" en-
compasses more than that, "[i]n the American legal tradi-
tion, liberty has long been understood as individual freedom
*from* governmental action, not as a right *to* a particular gov-
ernment entitlement." *Id.,* at 726; see also C. Green, Seven
Problems With Antidiscrimination Due Process, 11 Faulk-
ner L. Rev. 1, 32 (2019) ("Even on [a] very expansive view,
'liberty' is still only freedom from interference, rather than
positive rights to receive benefits or participate in others'
activities"). Consequently, if "liberty" in the Due Process
Clause does not include any rights to public benefits, it is
unclear how that provision can constrain the regulation of
access to those benefits.

Third, although the *Bolling* Court claimed that its deci-
sion "d[id] not imply that [due process and equal protection]

are always interchangeable phrases," 347 U. S., at 499, its logic led this Court to later erase any distinction between them. We now maintain that the "equal protection obligations imposed by the Fifth and the Fourteenth Amendments [are] indistinguishable." *Adarand Constructors, Inc.*, 515 U. S., at 217; see also *Sessions* v. *Morales-Santana*, 582 U. S. \_\_\_, \_\_\_, n. 1 (2017) (slip op., at 2, n. 1). But if "due process of law" fully subsumed the guarantee of equal protection, it is unclear why §1 of the Fourteenth Amendment would redundantly state both requirements in consecutive Clauses. See, *e.g.,* G. Maggs, Innovation in Constitutional Law, 86 Nw. U. L. Rev. 1038, 1053 (1992) (Maggs); R. Natelson, The Constitution and the Public Trust, 52 Buffalo L. Rev. 1077, 1174, n. 432 (2004); R. Primus, *Bolling* Alone, 104 Colum. L. Rev. 975, 976, n. 7 (2004).

Fourth, *Bolling* asserted that because the Constitution prohibits States from racially segregating public schools, "it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government." 347 U. S., at 500. For one, such moral judgments lie beyond the commission of the federal courts. For another, the assertion is debatable at best. "The Constitution contains many limitations that apply only to the states, or only to the federal government, and this Court is not free to disregard those aspects of the constitutional design." M. McConnell, Concurring in the Judgment, in What *Brown* v. *Board of Education* Should Have Said 166 (J. Balkin ed. 2001) (McConnell) (footnotes omitted); see also Maggs 1052. Likewise, "the enactors of the Fourteenth Amendment might have reasonably believed that [an equal protection] provision was not needed against the federal government" because it "had shown itself to be a much better protector of the rights of minorities than had the states." M. Rappaport, Originalism and the Colorblind Constitution, 89 Notre Dame L. Rev. 71, 90 (2013); see also J. Ely, Democracy and

Distrust 33 (1980); McConnell 167; K. Roosevelt, Forget the Fundamentals: Fixing Substantive Due Process, 8 U. Pa. J. Const. L. 983, 997 (2006).

In sum, the text and history of the Fifth Amendment's Due Process Clause provide limited support for reading into that provision an equal protection guarantee.

## II

Even if the Due Process Clause has no equal protection component, the Constitution may still prohibit the Federal Government from discriminating on the basis of race, at least with respect to civil rights. While my conclusions remain tentative, I think that the textual source of that obligation may reside in the Fourteenth Amendment's Citizenship Clause. That Clause provides: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." Amdt. 14, §1, cl. 1. As I sketch out briefly below, considerable historical evidence suggests that the Citizenship Clause "was adopted against a longstanding political and legal tradition that closely associated the status of 'citizenship' with the entitlement to legal equality." R. Williams, Originalism and the Other Desegregation Decision, 99 Va. L. Rev. 493, 501 (2013) (Williams); see also A. Amar, Intratextualism, 112 Harv. L. Rev. 747, 768–769 (1999). Thus, the Citizenship Clause could provide a firmer foundation for *Bolling*'s result than the Fifth Amendment's Due Process Clause.

## A

In the years before the Fourteenth Amendment's adoption, jurists and legislators often connected citizenship with equality. Namely, the absence or presence of one entailed the absence or presence of the other. See Williams 513–515 (discussing political discourse during the 1820s). By the

late 1850s, the connection was well established. For example, even Chief Justice Taney in *Dred Scott* v. *Sandford*, 19 How. 393 (1857), demonstrated this connection when discussing why, erroneously in my view, free blacks were "not intended to be included . . . under the word 'citizens' in the Constitution," and therefore could "claim none of the rights and privileges which that instrument provides for and secures to citizens of the United States." *Id.,* at 404. According to Taney, free blacks were at the founding "considered as a subordinate and inferior class of beings who had been subjugated by the dominant race, and, whether emancipated or not, yet remained subject to their authority, and had no rights or privileges but such as those who held power and the Government might choose to grant them." *Id.,* at 404–405.

He reached that conclusion after surveying discriminatory state laws and finding it "hardly consistent with the respect due to these States, to suppose that they regarded at that time, as fellow-citizens and members of the sovereignty, a class of beings whom they had thus stigmatized . . . and upon whom they had impressed such deep and enduring marks of inferiority and degradation." *Id.,* at 416. Under the Comity Clause of Article IV, moreover, States could not place "citizens" of the United States "in an inferior grade." *Id.,* at 423. Because it was long assumed that blacks could be placed in such an "inferior grade," how then could they be citizens? For Taney, then, States' longstanding and widespread practice of denying free blacks equal civil rights conclusively showed that blacks were not "citizens" entitled to various constitutional protections, such as the right to sue in federal court.

Senator Stephen Douglas, defending *Dred Scott* a few months later in Springfield, Illinois, expressed the converse of Taney's reasoning. He asked his audience, "What is the object of making [Dred Scott] a citizen?" and answered, "Of course to give him the rights, privileges and immunities of

a citizen, it being the great fundamental law in our Government, that under the law, citizens are equal in their rights and privileges." Kansas—The Mormons—Slavery, in A Political Textbook for 1860, p. 155 (H. Greeley & J. Cleveland eds. 1860). Thus, Douglas recognized that the bestowal of citizenship ineluctably entailed equal civil rights. Abolitionists agreed, but, unlike Taney and Douglas, reasoned that all persons—black or white—born in the United States were citizens and therefore entitled to equal civil rights. See Williams 515–518.[1]

After the Civil War, the Nation again confronted the citizenship status of black Americans. Though they were no longer slaves in light of the Thirteenth Amendment, the question remained whether, by virtue of their freedom from bondage, these native-born men and women were "citizens." Consistent with Taney's view in *Dred Scott*, southern governments rejected that free blacks were citizens and consequently enacted "Black Codes" that "restricted freed slaves' rights to make and enforce private contracts, to own and convey real and personal property, to hold certain jobs, to seek relief in court, and to participate in common life as ordinary citizens." J. Harrison, Reconstructing the Privileges or Immunities Clause, 101 Yale L. J. 1385, 1388 (1992).

---

[1] To be sure, not all agreed that citizenship entailed civil equality. Justice Curtis, dissenting in *Dred Scott* v. *Sandford*, 19 How. 393 (1857), argued that "citizenship, under the Constitution of the United States, is not dependent on the possession of any particular political or even of all civil rights." *Id.*, at 583; see also *United States* v. *Rhodes*, 27 F. Cas. 785, 790 (No. 16,151) (CC Ky. 1866) (Swayne, J., for the court) ("The fact that one is a subject or citizen determines nothing as to his rights as such"); 10 Op. Atty. Gen. 382, 398 (1862) ("I can hardly comprehend the thought of the absolute incompatibility of degradation and citizenship"); 2 J. Kent, Commentaries on American Law *258, n. *b* (9th ed. 1858) ("If a slave born in the United States be . . . lawfully discharged from bondage," he "becomes thenceforward a citizen" even if he remained subject to "such disabilities as the laws of the states respectively may deem it expedient to prescribe to free persons of color").

In response, Congress enacted the Civil Rights Act of 1866 to both repudiate *Dred Scott* and eradicate the Black Codes. The 1866 Act contained a citizenship clause similar to the Fourteenth Amendment's: "[A]ll persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States." Act of Apr. 9, 1866, 14 Stat. 27. The provision immediately succeeding that citizenship guarantee clarified that "such citizens, of every race and color" were entitled to

> "the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other." *Ibid.*

Fleshing out the implications of the citizenship declaration, this clause suggests that the right to be free of racial discrimination with respect to the enjoyment of certain rights is a constituent part of citizenship.

Moreover, as Congress debated the 1866 Act, "the view that the status of citizenship conferred upon its recipients at least some minimal level of equality rights was widely shared among both supporters and opponents." Williams 535. For instance, Representative Samuel Shellabarger argued that "the right of all citizens to be secured in the enjoyment of whatever privileges their citizenship does confer upon them is in its very nature equal . . . ." Cong. Globe, 39th Cong., 1st Sess., 1293 (1866). Representative Henry Jarvis Raymond, meanwhile, wanted Congress to declare that free blacks were citizens, "and thus secure to them whatever rights, immunities, privileges, and powers belong as of right to all citizens of the United States." *Id.,* at 1266;

see also *ibid.* ("[T]he right of citizenship involves everything else. Make the colored man a citizen of the United States and he has every right which you or I have as citizens of the United States . . . "). And after President Johnson's veto, Representative William Lawrence, the 1866 Act's principal House sponsor, maintained that "the very nature of citizenship" guaranteed an "equality of civil rights." *Id.,* at 1836.

The 1866 Act's reversal of *Dred Scott* raised questions whether Congress had such authority under the existing Constitution. See, *e.g.,* K. Lash, The Fourteenth Amendment and the Privileges and Immunities of American Citizenship 169 (2014). Once incorporated into the Fourteenth Amendment, the Citizenship Clause "forever closed the door on *Dred Scott*" and "constitutionalized the Civil Rights Act of 1866." *Id.,* at 171. When Senator Jacob Howard moved to add the Citizenship Clause, he and others characterized the Clause as largely "declaratory" of existing law, including the 1866 Act. Cong. Globe, 39th Cong., 1st Sess., at 2890 (remarks of Sen. Howard); see also *id.,* at 2896 (remarks of Sen. Doolittle). Then, as Congress considered the Citizenship Clause, Republicans reiterated the same equal-citizenship principle that featured in the debates over the 1866 Act. Senator John Conness, for instance, remarked that the 1866 Act guaranteed that all born in the United States "be regarded and treated as citizens of the United States, entitled to equal civil rights with other citizens of the United States." *Id.*, at 2891; see also Williams 543–548. And during the ratification debates, Republicans continued to publicly advocate that citizenship and equal civil rights were concomitant. See *id.,* at 549–554.

## B

In the years following the Fourteenth Amendment's ratification, several Justices also appeared to endorse this understanding of the Citizenship Clause, consistent with Reconstruction-era discourse. In the *Slaughter-House*

*Cases*, 16 Wall. 36 (1873), Justice Bradley's dissent articulated the equal-citizenship principle: "Citizenship of the United States ought to be, and, according to the Constitution, is, a sure and undoubted title to equal rights in any and every State in this Union." *Id.,* at 113. "If a man be denied full equality before the law, he is denied one of the essential rights of citizenship as a citizen of the United States." *Ibid.*; see also *id.,* at 118 ("Equality before the law is undoubtedly one of privileges and immunities of every citizen"). Justice Field's dissent similarly explained that the 1866 Act rested "upon the theory that citizens of the United States as such were entitled to the rights and privileges enumerated, and that to deny to any such citizen equality in these rights and privileges with others, was, to the extent of the denial, subjecting him to an involuntary servitude," *i.e.,* rejecting his status as a citizen. *Id.,* at 91–92.

Three years after the *Slaughter-House Cases*, Congress enacted the Civil Rights Act of 1875, prohibiting discrimination in public accommodations. During the congressional debates over the 1875 Act, Republicans reiterated the relationship between the status of "citizen" and entitlement to equal civil rights. See Williams 565–570; see also C. Green, Equal Citizenship, Civil Rights, and the Constitution 164–202 (2015) (collecting examples). In a virtually unanimous opinion, this Court held the 1875 Act unconstitutional because discrimination by public accommodations was not state action Congress could regulate under the Fourteenth Amendment. See *Civil Rights Cases*, 109 U. S. 3, 25–26 (1883). The lone dissenter, Justice John Marshall Harlan, focused primarily on citizenship and echoed Republicans' understanding of equal citizenship: "Citizenship in this country necessarily imports at least equality of civil rights among citizens of every race in the same State. It is fundamental in American citizenship that, in respect of such rights, there shall be no discrimination by the State . . .

against any citizen because of his race." *Id.,* at 48.

Only five years later, a unanimous Court in *Gibson* v. *Mississippi*, 162 U. S. 565 (1896), seemingly confirmed Harlan's understanding of citizenship and the textual source of the equal-citizenship guarantee. Writing for the Court, Justice Harlan declared that "the Constitution of the United States, *in its present form*, forbids, so far as civil and political rights are concerned, discrimination by *the General Government*, or by the States, against any citizen because of his race. All citizens are equal before the law." *Id.,* at 591 (emphasis added).[2] The Court's reference to the Constitution "in its present form" (*i.e.,* in 1896) indicates that the Court located an equality principle applicable to both the States and "the General Government" in the Fourteenth Amendment, not the Fifth. And because the usual textual candidates—the Privileges or Immunities Clause, Due Process Clause, and Equal Protection Clause—apply only to "State[s]," it stands to reason that *Gibson* understood the Citizenship Clause to forbid discrimination by the Federal Government "so far as civil . . . rights are concerned." *Ibid.*[3]

---

[2] Although *Bolling* v. *Sharpe*, 347 U. S. 497, 499 (1954), recited part of this quotation, it did not attempt to explain how *Gibson*'s discussion of racial equality among "citizens" implicated the Fifth Amendment's Due Process Clause, which applies broadly to all "person[s]."

[3] This understanding of the Citizenship Clause likely would not render other parts of the Fourteenth Amendment redundant. First, the Citizenship Clause would not make the Equal Protection Clause redundant because the latter applies to "person[s]," while the Citizenship Clause and Privileges or Immunities Clause apply to "citizens." See *McDonald* v. *Chicago*, 561 U. S. 742, 850, n. 19 (2010) (THOMAS, J., concurring in part and concurring in judgment). Additionally, the Equal Protection Clause may guarantee equality only with respect to a subset of rights related to "protection," while the Citizenship Clause and Privileges or Immunities Clause implicate a broader set of civil rights. See n. 4, *infra.* Second, this understanding of the Citizenship Clause also likely would not make the Privileges or Immunities Clause redundant. In particular, there is no evidence suggesting that Republicans disputed the proposition that citizens "could [not] be deprived of rights of national citizenship by *any*

The same year as *Gibson*, Justice Harlan also penned his dissent in *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), in which the Court upheld a Louisiana law requiring racial segregation on train cars. In asserting that the law was unconstitutional, Harlan did not rely on the Equal Protection Clause. Instead, he maintained that Louisiana's law was "inconsistent . . . with the equality of rights which pertains to citizenship, National and State." *Id.*, at 555. And Harlan's famous declaration underscores the connection between citizenship and equality: "Our Constitution is color-blind, and neither knows nor tolerates classes among *citizens*. In respect of civil rights, all *citizens* are equal before the law." *Id.,* at 559 (emphasis added). Given that the Equal Protection Clause speaks of "person[s]," rather than citizens, Harlan's reasoning in *Plessy* suggests that citizenship itself carried with it a right to equal treatment independent of the "equal protection of the laws" guaranteed to all "person[s]."[4]

——————

governmental entity, whether state or federal, consistent with the Fourteenth Amendment." R. Barnett & E. Bernick, The Original Meaning of the Fourteenth Amendment 202 (2021). "All that was constitutionally disputed among Republicans involved the status of national privileges and immunities *in the states*." *Id.,* at 203. Thus, the Privileges or Immunities Clause may have confirmed that *States* specifically could not abridge the rights of national citizenship, including whatever civil equality is guaranteed to "citizens" under the Citizenship Clause.

[4] Justice Harlan's decision not to rely on the Equal Protection Clause also makes some sense in light of that provision's object—the "Protection of the Laws." It is possible that the Equal Protection Clause does not prohibit discriminatory legislative classifications, but, consistent with its focus on "protection," instead only "imposes a duty on each state to protect all persons and property within its jurisdiction from violence and to enforce their rights through the court system." C. Green, The Original Sense of the (Equal) Protection Clause: Pre-Enactment History, 19 Geo. Mason U. Civ. Rights L. J. 1, 3 (2008); see also C. Green, The Original Sense of the (Equal) Protection Clause: Subsequent Interpretation and Application, 19 Geo. Mason U. Civ. Rights L. J. 219 (2009); J. Harrison, Reconstructing the Privileges or Immunities Clause, 101 Yale L. J. 1385, 1433–1451 (1992).

Beyond its emphasis on equal citizenship, Justice Harlan's *Plessy* dissent also specifically recognized that the Federal Government could not engage in racial discrimination. The Fourteenth Amendment, Harlan explained, "gave citizenship to all born or naturalized in the United States, and residing here," "obliterated the race line from our systems of governments, *National and State*," and "placed our free institutions upon the broad and sure foundation of the equality of all men before the law." *Id.,* at 563 (emphasis added). In short, Harlan understood that citizenship and equality went hand in hand and that equal citizenship prohibited the Federal Government, as much as the States, from discriminating with respect to civil rights.

While the historical evidence above is by no means conclusive, it offers substantial support for the proposition that, by conferring citizenship, the Citizenship Clause guarantees citizens equal treatment by the Federal Government with respect to civil rights.[5]

\*     \*     \*

Justice Harlan stated in *Plessy* that the Fourteenth Amendment "added greatly to the dignity and glory of American citizenship." *Id.* at 555. And the "best part of

---

[5]Adopting this understanding of the Citizenship Clause necessarily prompts additional questions. For example, beyond prohibiting racial discrimination with respect to civil rights, what other forms of discrimination does the Citizenship Clause proscribe? Is access to government benefits a "privilege" or "immunity" of citizenship—*i.e.,* a civil right? See, *e.g., id.*, at 1456 (observing that government benefits supported by general taxation might have been understood by the Reconstruction generation as a privilege of citizenship). And, most relevant to *Bolling* itself, is access to public education a "privilege" or "immunity" of citizenship? See, *e.g.,* M. McConnell, Originalism and the Desegregation Decisions, 81 Va. L. Rev. 947, 1023–1043, 1103–1105 (1995) (discussing the historical evidence).

citizenship," according to Charles Sumner, is "equality before the law." Cong. Globe, 42d Cong., 2d Sess., 384 (1872).[6] The Citizenship Clause's conferral of the "dignity and glory of American citizenship" may well prohibit the Federal Government from denying citizens equality with respect to civil rights. Rather than continue to invoke the Fifth Amendment's Due Process Clause to justify *Bolling*, in an appropriate case, we should more carefully consider whether this interpretation of the Citizenship Clause would yield a similar, and more supportable, result.

_____

[6] Sumner continued: "Ceasing to be a slave the former victim has become not only a man, but a citizen, admitted alike within the pale of humanity and within the pale of citizenship. As a man he is entitled to all the rights of man, and as a citizen he becomes a member of our common household with equality as the prevailing law. . . . Whatever he may have been, he is now the same as ourselves. Our rights are his rights; our equality is his equality; our privileges and immunities are his great possession." Cong. Globe, 42d Cong., 2d Sess., 385.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–303

_____

## UNITED STATES, PETITIONER *v.* JOSE LUIS VAELLO MADERO

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[April 21, 2022]

JUSTICE GORSUCH, concurring.

A century ago in the Insular Cases, this Court held that the federal government could rule Puerto Rico and other Territories largely without regard to the Constitution. It is past time to acknowledge the gravity of this error and admit what we know to be true: The Insular Cases have no foundation in the Constitution and rest instead on racial stereotypes. They deserve no place in our law.

I

The Insular Cases were the product of what John Hay called a "'splendid little war.'" F. Freidel, The Splendid Little War 3 (1958) (quoting letter from J. Hay to T. Roosevelt). Ostensibly waged to liberate Cuba and avenge the sinking of the *Maine*, the Spanish-American War proved a boon for the country's burgeoning colonial ambitions. See J. Cabranes, Citizenship and the American Empire, 127 U. Pa. L. Rev. 391, 392–395, and nn. 3–4 (1978) (Cabranes); K. Wenzer, Theodore Roosevelt and the United States Battleship *Maine*, 9 Fed. Hist. 111, 113–116, 124–128 (2017). The aging Spanish empire was in no position to defend its island possessions, and several fell to American forces in quick succession. See G. Lawson & G. Seidman, The Constitution of Empire: Territorial Expansion and American Legal History 111 (2004) (Lawson & Seidman). Under the

ensuing peace treaty signed in 1898, the United States took possession of Puerto Rico, Guam, and the Philippines. Treaty of Paris, Arts. 1–3, Dec. 10, 1898, 30 Stat. 1755–1756.

But these acquisitions, hard on the heels of the annexation of Hawaii, soon ignited a fierce debate. Some argued that our republican traditions prevented the United States from governing distant possessions as subservient colonies without regard to the Constitution. Others sought to devise new theories by which Congress could permanently rule the country's new acquisitions as a European power might, unrestrained by domestic law. See Cabranes 395.

Leading members of the legal academy provided influential support for those in the second camp. Their work culminated in a series of articles in the Harvard Law Review in 1899. Christopher Langdell argued that the Bill of Rights was "so peculiarly . . . English that an immediate and compulsory application of [those rights] to ancient and thickly settled Spanish colonies would furnish . . . proof of our unfitness to govern dependencies, or deal with alien races." The Status of Our New Territories, 12 Harv. L. Rev. 365, 386 (1899). James Bradley Thayer contended that "there is no lack of power in our nation . . . to govern these islands as colonies, substantially as England might govern them." Our New Possessions, 12 Harv. L. Rev. 464, 467 (1899). Abbott Lawrence Lowell submitted that, "apart from treaty or legislation, possessions acquired by conquest or cession do not become a part of the United States," and "constitutional limitations . . . do not apply." The Status of Our New Possessions: A Third View, 13 Harv. L. Rev. 155, 176 (1899). Such rules, he said, "are inapplicable except among a people whose social and political evolution has been consonant with our own." *Ibid.*

The debate over American colonialism made its first appearance in this Court in the form of a tax dispute in *Downes* v. *Bidwell*, 182 U. S. 244 (1901). Pursuant to the

Foraker Act, Congress erected a civil government in Puerto Rico and imposed a tax on goods exported to, or imported from, the new Territory. See Act of Apr. 12, 1900, ch. 191, §§ 2–3, 31 Stat. 77–78. After incurring a $659.35 tax bill, an importer challenged the Act as inconsistent with the Constitution's Tax Uniformity Clause, which provides that "all Duties, Imposts, and Excises shall be uniform throughout the United States." Art. I, § 8, cl. 1; *Downes*, 182 U. S., at 247, 249.

To answer the question whether the Act complied with the Constitution, the Court resolved that it first had to decide whether the Constitution applied *at all* in Puerto Rico. Ultimately, a fractured set of opinions emerged. Employing arguments similar to those advanced by Professors Langdell and Thayer, Justice Brown saw things in the starkest terms. Applying the Constitution made sense in "contiguous territor[ies] inhabited only by people of the same race, or by scattered bodies of native Indians." *Id.*, at 282. But it would not do for islands "inhabited by alien races, differing from us in religion, customs, laws, methods of taxation, and modes of thought." *Id.*, at 287. There, Justice Brown contended, "the administration of government and justice, according to Anglo-Saxon principles, may for a time be impossible." *Ibid.* On his view, the Constitution should reach Puerto Rico only if and when Congress so directed. *Id.*, at 279.

Justice White offered a different theory that drew on Professor Lowell's thinking. See Developments in the Law—The U. S. Territories, 130 Harv. L. Rev. 1616, 1617–1620 (2017). To Justice White, the Constitution's application depended on "the situation of the territory and its relations to the United States." *Downes*, 182 U. S., at 293 (concurring opinion). In some cases, Congress might express an intention to "incorporate" a Territory into the United States at a future date; in a Territory like that the Constitution must apply fully and immediately. *Id.*, at 339. But in other

cases, Justice White argued, only "fundamental" (if unspecified) aspects of the Constitution should have force. *Id.,* at 291. In his judgment, Puerto Rico fell into this second category and remained "foreign to the United States" because, unlike Territories in the American West, Congress had not done enough to indicate its intention to "incorporate" the island. *Id.*, at 341–342. Still, it would be a mistake to overstate the gap between the theories advanced by Justice White and Justice Brown. At bottom, both rested on a view about the Nation's "right" to acquire and exploit "an unknown island, peopled with an uncivilized race . . . for commercial and strategic reasons"—a right that "could not be practically exercised if the result would be to endow" full constitutional protections "on those absolutely unfit to receive [them]." *Id.*, at 306 (White, J., concurring).

In dissent, Chief Justice Fuller expressed astonishment that Congress could "keep [a Territory], like a disembodied shade, in an intermediate state of ambiguous existence for an indefinite period." *Id.*, at 372. Justice Harlan criticized the Court for "engraft[ing] upon our republican institutions a colonial system such as exists under monarchical governments." *Id.*, at 380. And Justice Harlan dismissed Justice White's supposed middle ground, which he could find nowhere in the Constitution's terms: "I am constrained to say that this idea of 'incorporation' has some occult meaning which my mind does not apprehend." *Id.*, at 391.

Later decisions blurred the line between Justice Brown's approach and Justice White's even further. Eventually, a majority embraced Justice White's "incorporation" theory, including its suggestion that certain constitutional protections are "fundamental" and therefore apply even in farflung "unincorporated" possessions. *Dorr* v. *United States*, 195 U. S. 138, 148–149 (1904). At the same time, it became clear that very few constitutional limits on the power of the federal government could be relied upon in the newly acquired Territories absent a clear congressional statement.

See, *e.g.*, *Hawaii* v. *Mankichi*, 190 U. S. 197, 215–216 (1903) (opinion of Brown, J.); *id.*, at 218–219 (White, J., concurring); Cf. S. Laughlin, The Burger Court and the United States Territories, 36 U. Fla. L. Rev. 755, 773 (1984) ("[W]hile Justice White had won the battle over which doctrine should nominally prevail, Justice Brown had won the war").

Even the right to trial by jury, the Court concluded, was not fundamental enough to apply in unincorporated Territories like Puerto Rico. *Balzac* v. *Porto Rico*, 258 U. S. 298, 306, 308–310 (1922). It did not matter to the Court that, by the time it reached the question, Congress had already granted Puerto Ricans U. S. citizenship. See Act of Mar. 2, 1917, § 5, 39 Stat. 953. In the Court's estimation, the "locality [was] determinative of the application of the Constitution, . . . not the status of the people who live in it." *Balzac*, 258 U. S., at 309. And, on the Court's account, Puerto Rico's "localities" included "compact and ancient communities" that had not yet developed the "impartial attitude" or "conscious duty of participation" required of citizens by the "Anglo-Saxon" jury trial. *Id.*, at 310.

## II

The flaws in the Insular Cases are as fundamental as they are shameful. Nothing in the Constitution speaks of "incorporated" and "unincorporated" Territories. Nothing in it extends to the latter only certain supposedly "fundamental" constitutional guarantees. Nothing in it authorizes judges to engage in the sordid business of segregating Territories and the people who live in them on the basis of race, ethnicity, or religion.

The Insular Cases can claim support in academic work of the period, ugly racial stereotypes, and the theories of social Darwinists. But they have no home in our Constitution or its original understanding. In this country, the federal government "deriv[es] its powers directly" from the sovereign

people, *McCulloch* v. *Maryland*, 4 Wheat. 316, 404–405 (1819), and is empowered to act only in accord with the terms of the written Constitution the people have approved, *Marbury* v. *Madison*, 1 Cranch 137, 176–177 (1803).  Empires and duchies in Europe may have subscribed to the "doctrine . . . that the people were made for kings, not kings for the people."  The Federalist No. 45, p. 289 (C. Rossiter ed. 1961) (J. Madison).  "Monarchical and despotic governments" may possess the power to act "unrestrained by written constitutions."  *Downes*, 182 U. S., at 380 (Harlan, J., dissenting).  But our Nation's government "has no existence except by virtue of the Constitution," and it may not ignore that charter in the Territories any more than it may in the States.  *Id.*, at 382.

The Insular Cases' departure from the Constitution's original meaning has never been much of a secret.  Even commentators at the time understood that the notion of territorial incorporation was a thoroughly modern invention.[1] The Insular Cases deviated, too, from this Court's prior and longstanding understanding of the Constitution.  In 1898, the very same year as the Spanish-American War, a lopsided majority of this Court judged it "beyond question" that the Constitution's jury-trial guarantees reached "the territories of the United States."  *Thompson* v. *Utah*, 170 U. S. 343, 346–347 (1898) (Harlan, J.).  Nearly 80 years before that, the Court held that the Constitution's Tax Uniformity Clause constrained legislation governing the District of Columbia.  *Loughborough* v. *Blake*, 5 Wheat. 317, 319 (1820) (Marshall, C. J.).  In between, this Court reached

———————————
[1] See C. Littlefield, The Insular Cases, 15 Harv. L. Rev. 169, 169–170 (1901); F. Coudert, The Evolution of the Doctrine of Territorial Incorporation, 26 Colum. L. Rev. 823, 832 (1926) (Coudert); see also M. Ramsey, Originalism and Birthright Citizenship, 109 Geo. L. J. 405, 435 (2020); Lawson & Seidman 196–197.

similar conclusions in case after case.[2]

With the passage of time, this Court has come to admit discomfort with the Insular Cases. See *Reid* v. *Covert*, 354 U. S. 1, 14 (1957) (plurality opinion); *Financial Oversight and Mgmt. Bd. for Puerto Rico* v. *Aurelius Investment, LLC*, 590 U. S. ___, ___–___ (2020) (slip op., at 21–22). But instead of confronting their errors directly, this Court has devised a workaround. Employing the specious logic of the Insular Cases, the Court has proceeded to declare "fundamental"—and thus applicable even to "unincorporated" Territories—more and more of the Constitution's guarantees. See S. Cleveland, Powers Inherent in Sovereignty: Indians, Aliens, Territories, and the Nineteenth Century Origins of Plenary Power Over Foreign Affairs, 81 Texas L. Rev. 1, 241–243 (2002) (collecting cases).

That solution is no solution. It leaves the Insular Cases on the books. Lower courts continue to feel constrained to apply their terms. See, *e.g.*, *Fitisemanu* v. *United States*, 1 F. 4th 862, 873 (CA10 2021); *Tuaua* v. *United States*, 788 F. 3d 300, 306–307 (CADC 2015). And the fictions of the Insular Cases on which this workaround depends are just that. What provision of the Constitution could any judge rightly declare less than fundamental? On what basis could any judge profess the right to draw distinctions between incorporated and unincorporated Territories, terms nowhere mentioned in the Constitution and which in the past have turned on bigotry? There are no good answers to these bad questions.

——————
[2] See, *e.g.*, *Springville* v. *Thomas*, 166 U. S. 707, 708–709 (1897) (Seventh Amendment jury-unanimity requirement applied in Utah Territory); *Wilkerson* v. *Utah*, 99 U. S. 130, 137 (1879) (Eighth Amendment prohibition on cruel and unusual punishment applied in Utah Territory); *Reynolds* v. *United States*, 98 U. S. 145, 154, 158, 162 (1879) (Sixth Amendment jury-trial and confrontation rights and First Amendment free-exercise right applied in Utah Territory); see also *Cross* v. *Harrison*, 16 How. 164, 193, 197–198 (1854) (domestic law, including the Tax Uniformity Clause, applied in California).

This workaround, too, has proven as ineffectual as it is inappropriate.  Perhaps this Court can continue to drain the Insular Cases of some of their poison by declaring provision after provision of the Constitution "fundamental" and thus operative in "unincorporated" Territories.  But even one hundred years on, that pitiable job remains unfinished.  Still today under this Court's cases we are asked to believe that the right to a trial by jury remains insufficiently "fundamental" to apply to some 3 million U. S. citizens in "unincorporated" Puerto Rico.  At the same time, the full panoply of constitutional rights apparently applies on the Palmyra Atoll, an uninhabited patch of land in the Pacific Ocean, because it represents our Nation's only remaining "incorporated" Territory.[3]  It is an implausible and embarrassing state of affairs.

The case before us only defers a long overdue reckoning.  Rather than ask the Court to overrule the Insular Cases, both sides in this litigation work from the shared premise that the equal protection guarantee under which Mr. Vaello Madero brings his claim is a "fundamental" feature of the Constitution and thus applies in "unincorporated" Territories like Puerto Rico.  See Tr. of Oral Arg. 10–11; Brief for

—————

[3] The atoll lies approximately 1,000 miles from Hawaii.  Palmyra Atoll, Dept. of Interior, Office of Insular Affairs (last visited Apr. 19, 2022), https://www.doi.gov/oia/islands/palmyraatoll (Palmyra Atoll DOI Overview).  When Congress supposedly "incorporated" Hawaii as a Territory, it included Palmyra, then a Hawaiian possession.  See Act of Apr. 30, 1900, ch. 339, §§ 2–5, 31 Stat. 141–142; *Hawaii* v. *Mankichi*, 190 U. S. 197, 211 (1903) (Congress "formally incorporated" Hawaii in 1900); *United States* v. *Fullard-Leo*, 331 U. S. 256, 259 (1947).  Ultimately, however, the atoll was not folded into Hawaii on statehood, and it remained under federal control.  See Act of Mar. 18, 1959, Pub. L. 86–3, § 2, 73 Stat. 4; Act of July 12, 1960, § 48, 74 Stat. 424.  So today our bureaucracies endow that Territory alone a capital "T" in their official lists while the others, Puerto Rico included, earn only a lowercase "t."  See Palmyra Atoll DOI Overview.

United States 12. Proceeding on the parties' shared premise, the Court applies the Constitution and holds that the conduct challenged here does not offend its terms. All that may obviate the necessity of overruling the Insular Cases today. But it should not obscure what we know to be true about their errors, and in an appropriate case I hope the Court will soon recognize that the Constitution's application should never turn on a governmental concession or the misguided framework of the Insular Cases. Asked why he dissented in those cases year after year, Justice Harlan replied that "'no question can be settled until settled right.'" Coudert 842. We should settle this question right.

To be sure, settling this question right would raise difficult new ones. Cases would no longer turn on the fictions of the Insular Cases but on the terms of the Constitution itself. Disputes are sure to arise about exactly which of its individual provisions applies in the Territories and how. Some of these new questions may prove hard to resolve. But at least they would be the right questions. And at least courts would employ legally justified tools to answer them, including not just the Constitution's text and its original understanding but the Nation's historical practices (or at least those uninfected by the Insular Cases). See *Fitisemanu*, 1 F. 4th, at 883 (Tymkovich, C. J., concurring); see also *NLRB* v. *Noel Canning*, 573 U. S. 513, 525 (2014); *id.*, at 572–574, and n. 1 (Scalia, J., dissenting); W. Baude, Constitutional Liquidation, 71 Stan. L. Rev. 1, 13–21 (2019). Nor, in any event, can the difficulty of the task supply an excuse for neglecting it.[4]

───────────

[4] In the last few years, some have attempted a revisionist account of the Insular Cases. On this view, this Court's decision to withhold full constitutional protection from "unincorporated" Territories (now) serves the beneficial end of safeguarding traditional cultures. See, *e.g.*, *Fitisemanu*, 1 F. 4th, at 870. Put aside the *amicus* briefs from the Governor of Puerto Rico, territorial advocacy groups, and the U. S. Virgin Islands expressing vehement disagreement with the Insular Cases. Put aside, too,

\*

Because no party asks us to overrule the Insular Cases to resolve today's dispute, I join the Court's opinion.  But the time has come to recognize that the Insular Cases rest on a rotten foundation.  And I hope the day comes soon when the Court squarely overrules them.  We should follow Justice Harlan and settle this question right.  Our fellow Americans in Puerto Rico deserve no less.

---

the uncomfortable truth that recent attempts to repurpose the Insular Cases merely drape the worst of their logic in new garb.  At bottom, the Constitution's restraints on federal power do not turn on a court's un-schooled assessment of a Territory's local customs or contemporary currents in public opinion or academic theory.  Our government may not deny constitutionally protected individual rights out of (purportedly) benign neglect any more than it may out of animus.

# SUPREME COURT OF THE UNITED STATES

No. 20–303

## UNITED STATES, PETITIONER *v.* JOSE LUIS VAELLO MADERO

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[April 21, 2022]

JUSTICE SOTOMAYOR, dissenting.

The Supplemental Security Income (SSI) program provides a guaranteed minimum income to certain vulnerable citizens who lack the means to support themselves. If they meet uniform federal eligibility criteria, recipients are entitled to SSI regardless of their contributions, or their State's contributions, to the United States Treasury, which funds the program. Despite these broad eligibility criteria, today the Court holds that Congress' decision to exclude citizen residents of Puerto Rico from this important safety-net program is consistent with the Fifth Amendment's equal protection guarantee. I disagree. In my view, there is no rational basis for Congress to treat needy citizens living anywhere in the United States so differently from others. To hold otherwise, as the Court does, is irrational and antithetical to the very nature of the SSI program and the equal protection of citizens guaranteed by the Constitution. I respectfully dissent.

## I

Congress' enactment of the SSI program in 1972 represented a major change in the Federal Government's relationship with States and Territories in assisting low-income individuals. Prior to 1972, means-based assistance for people over the age of 64, blind people, or those with disabilities

came in the form of programs administered and funded by
States and supplemented with matching federal funds. See
S. Rep. No. 92–1230, pp. 383–384.  One of those programs
was known as Aid to the Aged, Blind, and Disabled (AABD).
Under AABD, the States and Territories set their own in-
come and asset limits for individual participation and de-
termined their own benefit amounts.  See Brief for Public
Benefits Scholars as *Amici Curiae* 27.  The Federal Govern-
ment paid 75% of the benefits and 50% of the administra-
tive costs, subject to a statutory cap on total expenditures.
See Congressional Research Service, W. Morton, Cash As-
sistance for the Aged, Blind, and Disabled in Puerto Rico 12
(2016).

To provide a uniform, guaranteed minimum income for
the neediest adults, Congress established the SSI program
in 1972.  In creating the SSI program, Congress "displaced
the States." *Schweiker* v. *Gray Panthers*, 453 U. S. 34, 38
(1981).  Rather than dispensing money through block
grants to the States, SSI provides monthly cash benefits di-
rectly to qualifying low-income individuals who are over 65
years old, blind, or disabled.  The Federal Government sets
uniform qualifications for eligibility and fully funds the pro-
gram through mandatory appropriations from the general
fund of the United States Treasury.  See 42 U. S. C. §1381
*et seq*.  Unlike AABD benefits, SSI benefits do not vary
based on the specific State or Territory that a beneficiary is
located in, as long as the beneficiary is otherwise eligible.[1]
In sum, SSI created a fully nationalized assistance program
with federal administration, federal determination of eligi-
bility, and financed entirely from federal funds.

When Congress created SSI, it made the program availa-
ble only to "resident[s] of the United States," and it defined

_____

[1] The amount of benefits SSI pays to eligible recipients can vary, de-
pending, for instance, on whether the recipient has an "eligible spouse."
42 U. S. C. §1382(b).

United States as including "the 50 States and the District of Columbia." 42 U. S. C. §§1382c(a)(1)(B)(i), (e). Congress later extended the SSI program to residents of the Commonwealth of the Northern Mariana Islands. 90 Stat. 263, note following 48 U. S. C. §1801.

Although Puerto Rico is not a State, it has been part of the United States for well over a century, and people born in Puerto Rico are U. S. citizens.[2] In other contexts, Congress has made clear that references to the "United States" include Puerto Rico. See, *e.g.,* 52 U. S. C. §20310(8). In this context, however, Congress did not extend the SSI program to Puerto Rico and other Territories. Instead, Congress left in place the AABD program. See notes following 42 U. S. C. §§1381–1385.

Congress' decision not to include Puerto Rico in the SSI program has a significant impact on U. S. citizens in Puerto Rico. In 2021, 34,224 residents of Puerto Rico were enrolled in the AABD program; by contrast, in 2011, the Government Accountability Office estimates that over 300,000 Puerto Rico residents would have qualified for SSI. Brief for Hon. Jenniffer A. Gonzalez Colon, Resident Commissioner for Puerto Rico, as *Amicus Curiae* 28, 34. The 34,224 Puerto Rico residents enrolled in AABD in 2021 received an average of $82 per month, compared to the $574 per month that the average SSI recipient received in Fiscal Year 2020. *Id.,* at 29, 33. In other words, significantly fewer Puerto Rico residents are eligible for AABD than would be eligible for SSI, and the benefits they receive under AABD are hardly comparable to those they would likely receive under SSI.

_____

[2] By the 1898 Treaty of Paris, Spain "cede[d] to the United States the Island of Porto Rico." Treaty of Paris, Art. 2, Dec. 10, 1898, 30 Stat. 1755. Through the Jones Act of 1917, anyone born in Puerto Rico on or after April 11, 1899, became a United States citizen. Organic Act of Puerto Rico, §5, 39 Stat. 953.

## II

Jose Luis Vaello Madero is a U. S. citizen who was born in Puerto Rico in 1954. In 1985, he moved to New York, and in 2012, while still living in New York, he began receiving SSI after suffering from a serious illness. Approximately one year later, Vaello Madero moved back to Puerto Rico. Vaello Madero continued to receive monthly SSI payments of between $733 and $808 via direct deposit after he returned to Puerto Rico.

In June 2016, Vaello Madero, approaching his 62d birthday, went to a Social Security Administration office in Puerto Rico to apply for Title II Social Security benefits. As a result, the Social Security Administration learned that Vaello Madero had moved from New York to Puerto Rico, and within two months, the Administration reduced his SSI benefits to $0, retroactively effective to August 2013. By letter, the Administration notified Vaello Madero that he was "outside of the United States" while he was living in Puerto Rico. App. 39, 45.

In 2017, the United States filed suit against Vaello Madero to recover the $28,081 (plus interest, costs, and attorney's fees) that it calculated Vaello Madero had illegally cashed while he resided in Puerto Rico. As an affirmative defense to the suit, Vaello Madero claimed that excluding U. S. citizens who reside in Puerto Rico from the SSI program violated the equal protection guarantee of the Fifth Amendment.[3] The United States District Court for the District of Puerto Rico agreed, granting summary judgment to Vaello Madero.

The Court of Appeals unanimously affirmed. See 956

---

[3] The Fifth Amendment's Due Process Clause prohibits the Government from denying a person the equal protection of laws. See *Bolling* v. *Sharpe*, 347 U. S. 497, 499 (1954). "'Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.'" *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 224 (1995) (quoting *Buckley* v. *Valeo*, 424 U. S. 1, 93 (1976) (*per curiam*)).

F. 3d 12 (CA1 2020). The court agreed that rational-basis review applied to Vaello Madero's equal protection claim. It found no rational basis to exclude "individuals who meet all the eligibility criteria for SSI except for their residency in Puerto Rico." *Id.,* at 18. The court rejected the United States' argument that the tax status of Puerto Rico provided a rational basis for the challenged classification, explaining that SSI recipients are, by definition, low-income individuals who cannot afford to pay taxes. *Id.,* at 27. The Court of Appeals also observed that SSI is a "national program" that is operated and administered uniformly, without regard to State of residence. *Id.,* at 25. The court therefore declared invalid the "exclusion of Puerto Rico residents from SSI coverage." *Id.,* at 32.

The United States petitioned this Court for a writ of certiorari, which we granted. 592 U. S. \_\_\_ (2021).

## III

In general, the Equal Protection Clause guarantees that the Government will treat similarly situated individuals in a similar manner. Equal protection does not foreclose the Government's ability to classify persons or draw lines when creating and applying laws, but it does guarantee that the Government cannot base those classifications upon impermissible criteria or use them arbitrarily to burden a particular group of individuals. Where a law treats differently two different groups of people that are not members of a suspect or quasi-suspect classification, and the classification does not implicate a fundamental right, the law will survive an equal protection challenge if it is "rationally related to a legitimate governmental interest." *Department of Agriculture* v. *Moreno*, 413 U. S. 528, 533 (1973).

Rational-basis review is a deferential standard, but it is not "toothless." *Mathews* v. *Lucas*, 427 U. S. 495, 510 (1976). Even neutral classifications must "rationally ad-

vanc[e] a reasonable and identifiable governmental objective." *Schweiker* v. *Wilson*, 450 U. S. 221, 235 (1981). When the relationship between a statutory classification and its goal is "so attenuated as to render the distinction arbitrary or irrational," that distinction violates equal protection. *Nordlinger* v. *Hahn*, 505 U. S. 1, 11 (1992).

Congress' decision to exclude millions of U. S. citizens who reside in Puerto Rico from the SSI program fails even this deferential test.[4]

A

The United States contends, and the Court accepts, that Puerto Rico's "tax status" provides a rational basis for excluding citizens who reside in Puerto Rico from the SSI program. See *ante,* at 5 (emphasis deleted). As the United States argues, "Congress could rationally conclude that a jurisdiction that makes a reduced contribution to the federal treasury should receive a reduced share of the benefits funded by that treasury." Brief for United States 17–18.

The Court holds that our prior decisions in *Califano* v. *Torres*, 435 U. S. 1 (1978) (*per curiam*), and *Harris* v. *Rosario*, 446 U. S. 651 (1980) (*per curiam*), require acceptance of this rationale. *Ante,* at 4–5. It is true that both *Califano* and *Harris* relied on Puerto Rico's tax status to justify the unequal treatment of its residents. See *Califano*, 435 U. S.,

———————

[4] Because I would hold that this classification does not survive rational basis, I do not consider whether the differential treatment of citizens who reside in Puerto Rico requires a heightened standard of review, as the District Court held. See 356 F. Supp. 3d 208, 214–215 (PR 2019). In addition, because the Government disclaims any reliance on the Insular Cases, Tr. of Oral Arg. 8–9, I do not address those cases in my analysis. I do agree, however, with JUSTICE GORSUCH's view that it "is past time to acknowledge the gravity" of the error of the Insular Cases. *Ante*, at 1 (concurring opinion). Those cases were premised on beliefs both odious and wrong, and I share the concurrence's "hope [that] the Court will soon recognize that the Constitution's application should never depend on the government's concession or the misguided framework of the Insular Cases." *Ante*, at 9.

at 5, n. 7; *Harris*, 446 U. S., at 652. Neither case, however, stood for the principle that Puerto Rico's tax status could justify any and all unequal treatment of its residents, and neither addressed the claims at issue here. *Califano* resolved a claim under the right to travel, while *Harris* decided a challenge to the unequal distribution of block grants to the States and Puerto Rico under a separate benefits program. Those cases do not preclude an equal protection challenge to a uniform, federalized, direct-to-individual poverty reduction program like SSI. Moreover, as summary dispositions, *Califano* and *Harris* are not "of the same precedential value as would be an opinion of this Court treating the question on the merits." *Edelman* v. *Jordan*, 415 U. S. 651, 671 (1974). And both *Califano* and *Harris* rested on the mistaken premise that residents of Puerto Rico do not contribute at all to the Federal Treasury. *Califano*, 435 U. S., at 5, n. 7; *Harris*, 446 U. S., at 652. Here, the United States concedes that "residents of Puerto Rico make some contributions to the federal treasury." Brief for United States 19 (emphasis deleted).

Moreover, the Court overlooks the fact that SSI establishes a direct relationship between the recipient and the Federal Government. The Federal Government develops uniform eligibility criteria, recipients apply for assistance directly to the Federal Government, and the Federal Government disburses funds directly and uniformly to recipients without regard to where they reside. Indeed, when it created SSI, Congress replaced existing programs that differed between States as well as between States and Territories and that involved States and Territories in administering the programs. Under the current system, the jurisdiction in which an SSI recipient resides has no bearing at all on the purposes or requirements of the SSI program. For this reason alone, it is irrational to tie an individual's entitlement to SSI to that individual's place of residency.

While it is true that residents of Puerto Rico typically are exempt from paying some federal taxes,[5] that distinction does not create a rational basis to distinguish between them and other SSI recipients. By definition, SSI recipients pay few if any taxes at all, as the First Circuit correctly recognized below: "[B]y its very terms, only low-income individuals lacking in monetary resources are eligible" for SSI. 956 F. 3d, at 27. In fact, to qualify for SSI, recipients must have an income well below the standard deduction for single tax filers. *Ibid.* It is "antithetical to the entire premise of the program" to hold that Congress can exclude citizens who can scarcely afford to pay any taxes at all on the basis that they do not pay enough taxes. *Ibid.*

In some cases, it might be "reasonable for Congress to take account of the general balance of benefits to and burdens on" citizens when deciding eligibility for benefits. *Ante*, at 5. That is not a rational basis for this classification, however, because SSI is a means-tested program of last resort for the poorest Americans who lack the means even to pay taxes. Residents of Puerto Rico who would be eligible for SSI are like SSI recipients in every material respect: They are needy U. S. citizens living in the United States.

—————

[5] Both the District Court and the Court of Appeals below recognized that citizens who reside in Puerto Rico pay several of the same types of federal taxes as citizens who reside in a State. See 356 F. Supp. 3d, at 215, n. 9; 956 F. 3d 12, 24–26 (CA1 2020). The Court of Appeals explained that each year from 1998 to 2006 (when an economic recession set in), residents of Puerto Rico contributed in aggregate over $4 billion to the Federal Treasury, a sum larger than the contributions by residents of Vermont, Wyoming, and several other States. *Id.*, at 24. Even between 2016 and 2018, during the recession and despite several natural disasters, residents of Puerto Rico still contributed between $3 and $4 billion per year to the Treasury. *Id.,* at 24–25. Those contributions came in the form of "federal income taxes by residents of Puerto Rico on income from sources outside Puerto Rico," "the regular payment of federal income taxes by all federal employees in Puerto Rico," and "the full Social Security, Medicare, and Unemployment Compensation taxes that are paid in the rest of the United States." *Id.,* at 25 (footnote omitted).

## B

The Court cautions that holding this classification unconstitutional would "usher in potentially far-reaching consequences," such as requiring the extension of other federal programs to citizens who reside in all Territories. *Ante*, at 5. It bears noting that tax status did not preclude Congress' extension of SSI to the Northern Mariana Islands, undermining that justification as a rational basis to distinguish Puerto Rico from the States. In any event, the Court identifies no federal program other than SSI that operates in such a uniform, nationalized, and direct manner. For instance, the Supplemental Nutrition Assistance Program is administered by local governments. See Brief for Public Benefits Scholars as *Amici Curiae* 8–9. That distinction alone may justify differential treatment by jurisdiction of residence.

In fact, it is the Court's holding that might have dramatic repercussions. If Congress can exclude citizens from safety-net programs on the ground that they reside in jurisdictions that do not pay sufficient taxes, Congress could exclude needy residents of Vermont, Wyoming, South Dakota, North Dakota, Montana, and Alaska from benefits programs on the basis that residents of those States pay less into the Federal Treasury than residents of other States.[6] Congress has never enacted a uniform, nationalized direct assistance program, and then excluded entire States on the basis that the taxpaying residents of that State do not pay sufficient federal taxes. The Court's holding today suggests that doing so would be constitutional and not a violation of the Constitution's promise of equal protection of citizens.

———————

[6] The United States concedes that the analysis would be the same if Congress excluded residents of a State from the SSI program. Tr. of Oral Arg. 6.

\*     \*     \*

SSI is designed to support the neediest citizens. As a program of last resort, it is aimed at preventing the most severe poverty. In view of that core purpose, denying benefits to hundreds of thousands of eligible Puerto Rico residents because they do not pay enough in taxes is utterly irrational.

Congress' decision to deny to the U. S. citizens of Puerto Rico a social safety net that it provides to almost all other U. S. citizens is especially cruel given those citizens' dire need for aid. Puerto Rico has a disproportionately large population of seniors and people with disabilities. See Brief for AARP et al. as *Amici Curiae* 8–10. The Census Bureau estimated that in 2019, 43.5% of residents of Puerto Rican residents lived below the poverty line—more than triple the national percentage of 12.3%. See C. Benson, American Community Survey Briefs, Poverty: 2018 and 2019, p. 5 (Sept. 2020), https://www.census.gov/content/dam/Census/library/publications/2020/acs/acsbr20-04.pdf.

Equal treatment of citizens should not be left to the vagaries of the political process. Because residents of Puerto Rico do not have voting representation in Congress, they cannot rely on their elected representatives to remedy the punishing disparities suffered by citizen residents of Puerto Rico under Congress' unequal treatment.

The Constitution permits Congress to "make all needful Rules and Regulations" respecting the Territories. Art. IV, §3, cl. 2. That constitutional command does not permit Congress to ignore the equally weighty constitutional command that it treat United States citizens equally. I respectfully dissent.